UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

                                 Case No. 2:24-cr-20070-DDC

NEWTON JONES (01),
WILLIAM CREEDEN (02),
KATERYNA JONES (03),
LAWRENCE MCMANAMON (05),

    *Defendants*.

**Defendant William Creeden's
Motion for a Judgment of Acquittal**

**Table of Contents**

Motion for a Judgment of Acquittal ....................................................................... 5

Summary of the Argument.................................................................................... 6

Argument ............................................................................................................ 8

I.    Count 1 warrants a judgment of acquittal. ................................................. 9

      A.    No distinct enterprise................................................................... 9

            1.    Count 1 required proof that the "Jones Enterprise" actually existed as a RICO "enterprise." ................................................ 9

            2.    The IBB is not the "enterprise" and could not be. .........................11

            3.    The officers and employees of an organization cannot, in the ordinary course of their duties, constitute a distinct "enterprise.". 12

            4.    Proof showed only IBB personnel acting in that capacity. ............... 16

      B.    The government did not prove an agreement. ...........................................19

            1.    The law requires agreement. ........................................................... 19

            2.    Circumstantial proof still must prove agreement. ...........................20

            3.    Parallel conduct does not prove agreement. ....................................20

            4.    The record shows role performance. ............................................... 21

            5.    The witnesses did not supply the agreement.................................22

      C.    The government did not prove *one* RICO conspiracy................................ 23

            1.    The law requires a connected conspiracy. ...................................... 23

            2.    The proof showed separate spokes...................................................24

            3.    The Bank evidence did not create one conspiracy...........................24

II.    Count 48 warrants a judgment of acquittal............................................ 25

    A.    The government did not prove an unauthorized appropriation.................. 26

        1.    Section 501(c) requires lack of authorization................................. 26

        2.    The IEC authorized the loan. ......................................................... 26

        3.    The government's loan-label argument does not create unauthorized appropriation............................................................. 27

        4.    The Bank board approved the loan too............................................ 28

    B.    The government did not prove deprivation of value. ................................ 29

        1.    Section 501(c) requires a deprivation of union value....................... 30

        2.    The loan exchanged money for an enforceable repayment right. .... 30

        3.    The union received repayment with interest................................... 31

    C.    The government did not prove conversion to Mr. Creeden's own use. ...... 32

        1.    Section 501(c) requires conversion *to a prohibited use*...................... 32

        2.    The government proved no personal benefit to Mr. Creeden. ........ 33

    D.    The government did not prove fraudulent intent...................................... 34

        1.    Section 501(c) requires criminal intent........................................... 34

        2.    Mr. Creeden abstained from the Bank board vote. ......................... 35

        3.    The transaction was open and documented. .................................. 35

        4.    The loan returned value to the union. ............................................ 36

III.   Count 53 warrants a judgment of acquittal. ............................................ 37

    A.    The government proved no deception. ...................................................... 37

        1.    Wire fraud requires a deceptive act. ............................................... 37

        2.    Payroll processing did not induce the compensation....................... 38

        3.    The Bank knew Mr. Creeden's IBB role. ........................................ 39

B.  The government proved no decisional influence........................................ 40

C.  The government proved no money-or-property object. ........................... 41

  1.  Wire fraud requires money or property as the object. .................... 41

  2.  The LM-30 and Conflict Policy theories are not property fraud. .... 42

IV.  Counts 2 through 48 warrant a judgment of acquittal. .......................................... 44

A.  The government did not prove lack of authorization. ............................... 45

B.  The same authorization defect defeats the remaining § 501(c) counts....... 47

V.  Other important counts warrant a judgment of acquittal. ..................................... 48

A.  Count 19 fails because the government proved neither principal liability nor aiding-and-abetting liability.................................................................. 48

B.  Count 45 fails because Creeden was retired at the time. ........................... 49

VI.  The mixed verdict underscores the need for Rule 29 relief.................................. 51

VII.  The government's theory has no limiting principle. ............................................. 51

A.  The government erases elements that separate governance from crime. ....51

B.  The theory turns ordinary organizational execution into felony exposure. 52

C.  The trial proof confirmed that the government has no workable line......... 53

D.  Federal criminal law cannot leave that line to prosecutorial discretion...... 53

Conclusion ......................................................................................................................... 55

**Motion for a Judgment of Acquittal**

Defendant William Creeden moves for a judgment of acquittal as to all counts on all grounds pursuant to Federal Rule of Criminal Procedure Rule 29(c). He both (i) renews the motion for a judgment of acquittal that he presented at the close of the government's evidence, Doc. 406, which the Court reserved decision on, 18 Trial Tr. 4091, and (ii) moves anew for a judgment of acquittal as to all counts on all grounds in light of all the evidence.

Mr. Creeden's Rule 29 motions constitute *general* motions that seek a judgment of acquittal as to all counts on all grounds. In addition to and without waiving, forfeiting, or otherwise compromising any aspect of the general motions, Mr. Creeden submits that a judgment of acquittal is especially warranted for the reasons given by this brief.

As an alternative to his motions for a judgment of acquittal, Mr. Creeden is also separately submitting a motion for a new trial. The Court should decide the motions for a judgment of acquittal *before* addressing the motion for a new trial. The sequence is:

1. First, the Court should fully resolve all Rule 29 motions.

2a. Insofar as any Rule 29 relief *is* granted, the Court "must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d). In that case, the Court should determine Mr. Creeden's motion for a new trial conditionally and grant it.

2b. Insofar as Rule 29 relief is *not* granted, the Court should determine Mr. Creeden's motion for a new trial unconditionally and grant it.

5

**Summary of the Argument**

William Creeden committed no crime. He was just doing his job.

Count 1 fails because the government did not prove the charged RICO enterprise or the charged RICO conspiracy. The indictment charged a "Jones Enterprise," not the IBB. But the evidence showed IBB personnel doing IBB business through IBB offices, IBB authority, IBB channels, IBB accounting systems, and IBB objectives. Under *Liberty Group* (10th Cir. 1992), and related Tenth Circuit authority, that ordinary-course organizational proof does not establish a distinct association-in-fact enterprise. Nor did the government prove a connected enterprise conspiracy; it proved only separate Jones-centered spokes without the rim required to make them one RICO conspiracy. The government also failed to prove the necessary agreement, as opposed to parallel conduct. Count 1 therefore rests on office, proximity, and parallel administration—not proof of a distinct enterprise, a connected conspiracy, or Mr. Creeden's agreement to join one.

Count 48 fails for four independent reasons. The IEC authorized lending to the Bank of Labor up to $20 million, and the charged $7 million transaction fell within that authorization. Mr. Creeden was not an IEC member. The Bank board separately approved the loan unanimously, with Mr. Creeden abstaining. The loan also did not convert union property to Mr. Creeden's use. The money went to an IBB-affiliated banking institution, returned with interest, and generated a gain for the union. Nor did the government prove fraudulent intent. Mr. Creeden abstained from the Bank board vote, and the transaction was transparent, documented, audited, reported, repaid, and regulatorily approved.

Count 53 fails because wire fraud requires deception, decisional influence, and money or property as the object. The government proved none. The Bank knew Mr. Creeden's IBB role, approved his Bank role, set his compensation, reviewed the arrangement, and continued it. The compensation and related financial information also appeared in public IRS Form 990 filings, reinforcing that this was an openly reported institutional arrangement, not a hidden scheme. A known fact cannot materially influence a decisionmaker who already knows it.

Counts 2 through 48 fail because the government did not prove lack of authorization. Section 501(c) punishes theft-like conduct. It does not punish a union officer for processing expenditures authorized through the President, the IEC, or ordinary union channels. Count 19 separately illustrates the defect. The government charged Mr. Creeden with another person's travel, but it proved neither that the traveler committed a crime nor that Mr. Creeden converted the travel money to his own use.

The government's key theories also lack coherent limiting principles. Each works by deleting the element that separates governance from crime. They turn internal governance disputes into federal felonies by treating ordinary organizational conduct as racketeering, approved transactions as theft, and disclosure/conflict theories as property fraud. That expansion would federalize routine questions of officer authority, board approval, compensation, travel, and recordkeeping across unions, nonprofits, associations, and corporate boards. The Court should reject that theory and enforce the statutory elements Congress enacted.

**Argument**

Rule 29 requires acquittal when the evidence is insufficient to sustain a conviction. The governing question is whether any rational trier of fact could have found every essential element beyond a reasonable doubt. *See, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Court may not weigh evidence or reassess credibility. But it must grant acquittal where, as here, the conviction rests on speculation, suspicion, or unsupported inference stacking. *See, e.g.*, *United States v. Garcia*, 74 F.4th 1073, 1110–17 (10th Cir. 2023) (per curiam). That analysis must proceed count by count, element by element, and defendant by defendant. Extensive Rule 29 relief is warranted for Mr. Creeden here.

The argument proceeds in three layers. Parts I, II, and III provide extended count-specific arguments for the most important counts. Part I addresses Count 1, the charge that Mr. Creeden conspired to violate RICO through the alleged "Jones Enterprise." Part II addresses Count 48, the § 501(c) charge based on the $7 million MORE Fund loan to the Bank of Labor. Part III addresses Count 53, the wire-fraud charge based on Mr. Creeden's Bank of Labor compensation. Part IV then addresses the authorization defect that defeats Counts 2 through 48 as a group. Part V adds two count-specific grounds. Count 19 fails because the government charged Mr. Creeden with another person's travel but proved neither principal liability nor aiding-and-abetting liability. *See infra* Part V.A. Count 45 fails because the charged vacation payout occurred after Mr. Creeden retired from the union. *See infra* Part V.B. Those grounds are cumulative, not alternative.

## I.    Count 1 warrants a judgment of acquittal.

Count 1 alleged a conspiracy to violate 18 U.S.C. § 1962(a)-(c) through the "Jones Enterprise," not through the IBB. Doc. 1 at 11–27. The proof failed at every level. The government proved no enterprise distinct from the IBB, no agreement by Mr. Creeden to join a criminal enterprise, and no connected RICO conspiracy beyond separate Newton Jones-centered allegations.

### A.    No distinct enterprise

Count 1 fails because the government proved only the IBB's own enterprise, not the actual existence of a distinct RICO "enterprise." The indictment charged a "Jones Enterprise" that had to actually exist and meet the "enterprise" definition. Doc. 1 at 11–27. But the proof showed only IBB personnel doing IBB business via IBB titles, authority, and channels. That violates the distinctness rule of *Board of County Commissioners of San Juan County v. Liberty Group*, 965 F.2d 879 (10th Cir. 1992), which holds that "the officers and employees of an organization cannot, in the ordinary course of their duties, constitute an association in fact separate from the organization itself." *Id.* at 886.

#### 1.    Count 1 required proof that the "Jones Enterprise" actually existed as a RICO "enterprise."

Count 1 alleges a conspiracy to violate RICO's main proscriptions, 18 U.S.C. § 1962 (a)-(c). Doc. 1 at 11–27. To sustain such a conviction, the government had to prove (among other things) both that the alleged "Jones Enterprise" actually existed and that the "Jones Enterprise" constituted a RICO "enterprise" within the meaning of § 1961. Orthodox RICO law requires both of these showings and the government's election confirms it.

9

First, the indictment's own theory required proof that the alleged "Jones Enterprise" actually existed as a RICO enterprise. Count 1 did not charge an abstract enterprise, a generic vehicle, or the IBB itself. It charged an association-in-fact called the "Jones Enterprise," composed of "certain officers, employees, members, and associates of the Boilermakers Union." It alleged that this Jones Enterprise was an ongoing organization, functioned as a continuing unit, shared a common enterprise purpose, and was the enterprise whose affairs the defendants agreed to conduct through racketeering. Doc. 1 at 11–16. Standard RICO law required proof of that enterprise as charged: purpose, relationships, and longevity. The government could not assume that proof from the IBB's existence, the defendants' offices, or the alleged predicate acts.

Second, the government's election locked in this path. A court's review of sufficiency "may well be constrained by . . . waiver, forfeiture, and estoppel" when the government fails to object to instructions imposing a heightened burden. *United States v. Iverson*, 818 F.3d 1015, 1027 n.5 (10th Cir. 2016) (citation and quotation marks omitted). Here, the government took an even more definitive step that binds it completely.

Before the charge was settled, Mr. Creeden forced a choice between two theories: an inchoate theory, under which the agreement would have produced a qualifying enterprise, and an existing-enterprise theory, under which the Jones Enterprise had to exist. Doc. 425. The government chose the latter. It told the Court that "the Government elects to proceed with the theory that the evidence establishes a RICO enterprise." Doc. 426 at 3. That election was required and binds the sufficiency analysis. The government

10

cannot retreat to a would-have-existed theory or defend Count 1 through an undefined enterprise. It had to prove an existing Jones Enterprise. It did not.

### 2. The IBB is not the "enterprise" and could not be.

The IBB is not the charged enterprise. Count 1 charged a separate association-in-fact enterprise called the "Jones Enterprise." It did not charge the IBB.

The IBB is not the government's proven enterprise either. The government did not try the case on an IBB-as-enterprise theory. It used the IBB only as the institutional setting: the labor organization whose money, structure, policies, records, and approval systems supplied the backdrop for the alleged racketeering. *See, e.g.*, 20 Trial Tr. 4232–33 (prosecution positing that "The Jones Enterprise is not the Boilermakers Union" and that "The Boilermakers Union is actually the victim of the Jones Enterprise"); 18 Trial Tr. 4064–66 (prosecution conceding that "the United States has alleged that the enterprise, the Jones Enterprise, is not the IBB itself").

Treating the IBB as the enterprise would rewrite Count 1 and collapse the alleged enterprise into the organization the government says was victimized. It would also create distinctness, variance, victim-enterprise, authorization, and agreement problems the government never tried to solve. The government avoided those problems by charging the "Jones Enterprise." That choice carried a burden: prove a separate RICO enterprise. The proof did not do that.

11

### 3. The officers and employees of an organization cannot, in the ordinary course of their duties, constitute a distinct "enterprise."

The distinctness rule controls this case. RICO requires "two distinct entities": a RICO "person" and a RICO "enterprise." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). The Tenth Circuit applied that principle before *Cedric Kushner* too. *Garbade v. Great Divide Mining & Milling Corp.*, 831 F.2d 212, 213 (10th Cir. 1987). And where, as here, organizational personnel allegedly constitute a RICO "enterprise" distinct from the organization itself, *Liberty Group* supplies the governing rule: "the officers and employees of an organization cannot, in the ordinary course of their duties, constitute an association in fact separate from the organization itself." *Board of County Commissioners of San Juan County v. Liberty Group*, 965 F.2d 879, 886 (10th Cir. 1992).

Later Tenth Circuit authority reinforces the point. *Brannon v. Boatmen's First National Bank of Oklahoma*, 153 F.3d 1144 (10th Cir. 1998), shows that a corporation cannot establish distinctness by pointing to its own officers and employees. *Id.* at 1147-49 & n.4 *George v. Urban Settlement Services*, 833 F.3d 1242 (10th Cir. 2016), quoted *Liberty Group* and reaffirmed that an entity acting through subsidiaries, agents, or employees typically cannot be both RICO person and enterprise. *Id.* at 1249. *Llacua v. Western Range Association*, 930 F.3d 1161 (10th Cir. 2019), held that an organization cannot join with its own members to do what it normally does and thereby form a separate enterprise. *Id.* at 1182–85.

12

Distinctness does not ask whether personnel acted wisely, fairly, or even lawfully. Those questions concern legality. Distinctness asks whose conduct the proof showed. That inquiry turns on attribution: the capacity in which personnel acted, the roles they occupied, the authority they invoked, the channels they used, and the objectives they pursued. Conduct that flows through ordinary organizational roles for ordinary organizational purposes remains organizational conduct. The government cannot transform it into a separate RICO enterprise by later calling it wrong, abusive, or criminal.

Alleged illegality does not sever organizational attribution. A legal entity acts through human beings, and conduct by officers or employees in their organizational capacity remains the entity's conduct for distinctness purposes even if later attacked as wrongful or criminal. *Cedric Kushner* confirms the point: an employee who conducts corporate affairs through an unlawful RICO pattern uses the corporation as the vehicle "whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." *Cedric Kushner*, 533 U.S. at 164-66. *Liberty Group* applies the same attribution logic, and so do a wealth of other authorities, *see George v. Urban Settlement Services*, 833 F.3d 1242, 1249 (10th Cir. 2016) ("a defendant corporation, acting through its subsidiaries, agents, or employees typically can't be both the RICO 'person' and the RICO 'enterprise'"); *Brannon v. Boatmen's First National Bank of Oklahoma,* 153 F.3d 1144, 1147-49 & n.4 (10th Cir. 1998) (rejecting distinctness theory built from a corporation and its officers or employees); *Llacua v. Western Range Association*, 930 F.3d 1161, 1182–85 (10th Cir. 2019) (rejecting enterprise theory where an organization allegedly joined with its own

13

members to do what it normally does); *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1355–57 (11th Cir. 2016) (holding that a corporation is not distinct from its officers, agents, and employees when they operate in their official capacities, even assuming alleged misrepresentations); *Taylor v. Phelan*, 912 F.2d 429, 433 (10th Cir. 1990) (recognizing that a principal is liable for acts committed by an agent within the course or scope of employment); *Willcox v. Boeing Military Airplane Co.*, No. 87-1015-C, 1989 WL 107728, at *2 (D. Kan. Aug. 23, 1989) (applying Kansas law and recognizing attribution for torts committed within the scope of authority and course of employment even when unauthorized or unratified).

Because an organization can act only through human intermediaries, its officers and employees do not become a separate association-in-fact enterprise merely by acting through the organization's offices, authority, and channels. That does not mean the IBB is criminally liable. It means only that distinctness asks whose conduct the proof showed. The government cannot create a separate "Jones Enterprise" by labeling IBB personnel's IBB-capacity conduct illegal. Legality and attribution are different questions.

Under that distinctness principle, ordinary-course proof does not suffice. It is not enough to show ordinary institutional objectives pursued badly, excessively, or unlawfully. Nor is it enough to show those objectives pursued through ordinary institutional channels. The government needed proof of separation from the ordinary course: extraordinary objectives distinct from normal IBB governance, or extraordinary roles, channels, and methods distinct from normal IBB authority.

14

Mr. Creeden did not have to disprove a separate enterprise. The government had to prove one. But the government's own proof eliminated any serious claim that the Jones Enterprise existed apart from the IBB by showing the opposite. It proved IBB leaders acting as IBB leaders, through IBB authority, using IBB systems, for asserted IBB purposes. The IBB Constitution supplied the relevant offices and authority: the IEC supervised the union's business and financial affairs, the International President served as the principal executive officer, and the International Secretary-Treasurer performed finance-office duties within that constitutional structure.[1]

The same pattern held across the government's proof. Travel moved through assignment letters and travel packets.[2] Union investments and Bank of Labor issues moved through IEC minutes, Bank structures, and formal institutional approvals.[3] Legal and

---

[1] *See* 3 Trial Tr. 127–28, 130 (Simmons identifying the International President as the union's chief executive officer and the International Secretary-Treasurer as the second-highest officer); 3 Trial Tr. 160–62 (Simmons explaining Article 9 and the Secretary-Treasurer's finance-office duties); 3 Trial Tr. 166–67 (Simmons explaining Article 5.2 and the IEC's supervisory authority over union financial affairs); 3 Trial Tr. 160 (Simmons testifying that the Secretary-Treasurer was required to pay expenses authorized by the President).

[2] *See* 12 Trial Tr. 2601, 2785–86 (Newman identifying assignment letters and confirming Newton Jones as signatory); 12 Trial Tr. 2615–19 (Newman identifying travel packets and general-ledger payment records for IBB travel); 12 Trial Tr. 2622 (Newman identifying Wiser assignment-letter materials).

[3] *See* 4 Trial Tr. 499–500 (Simmons identifying Exhibit 1084, the December 6, 2009 IEC minutes authorizing a line of credit to the Bank of Labor up to $20 million); 6 Trial Tr. 879–82 (Fairley addressing the $20 million authorization); 6 Trial Tr. 878 (Fairley

disciplinary issues moved through Blake & Uhlig, Article 17 proceedings, IEC minutes, transcripts, and forensic-audit channels.[4]

In other words, the government showed only ordinary institutional subjects—travel, expense approval, compensation, personnel, legal work, and union investments—handled through ordinary institutional means: official titles, assignment letters, expense forms, accounting systems, IEC action, and constitutional authority. That is the IBB acting through its personnel. It is not a distinct RICO association-in-fact.

### 4.    Proof showed only IBB personnel acting in that capacity.

The government's proof showed IBB personnel acting through IBB roles, not a separate enterprise acting through separate authority. Every important feature of the alleged "Jones Enterprise" came from the IBB.

First, the titles and authority were IBB's. The defendants acted as IBB officers, employees, or agents. Their authority came from the IBB Constitution, the IBB organizational chart, the International President's executive authority, the International Secretary-Treasurer's finance-office duties, and the IEC's power over union

---

addressing the Bank dual-role arrangement); 13 Trial Tr. 2932 (McCall testifying that the IBB owned approximately 58 to 59 percent of the Bank of Labor holding company).

[4] *See* 4 Trial Tr. 291–93 (Simmons identifying the September 2022 Blake & Uhlig memorandum and its LMRDA references); 4 Trial Tr. 349–52 (Simmons describing the Article 17 charges and hearing transcript); 4 Trial Tr. 362–67 (Simmons describing the Withum forensic audit and report); 4 Trial Tr. 331–34, 432–33, 437 (Simmons addressing Blake & Uhlig counsel's attendance at headquarters discussions and McManamon's lack of opposition); 4 Trial Tr. 453-55 (Simmons identifying IEC minutes from 2021 through 2023).

expenditures.[5] The government did not prove any authority structure belonging to a separate Jones Enterprise.

Second, the approval channels were IBB's. Expenses moved through accounting, HR, and ordinary approval forms.[6] Personnel and compensation decisions moved through written appointment, compensation, and administrative channels.[7] IEC action moved through IEC minutes and resolutions. Internal disputes moved through the IBB's Article 17 process.[8] Legal advice moved through union counsel.[9] The government proved paperwork moving through union channels, not a racketeering enterprise using its own.

---

[5] *See* 3 Trial Tr. 127–28 (Simmons testifying that the International President and International Secretary-Treasurer are the union's two highest constitutional offices); 3 Trial Tr. 159–60 (Simmons explaining Article 9.1 and the Secretary-Treasurer's treasury duties); 3 Trial Tr. 164–65 (Simmons explaining Article 7.1 and the President's executive and administrative authority); 3 Trial Tr. 166–67 (Simmons explaining Article 5.2 and the IEC's supervisory authority over union business and financial affairs); 5 Trial Tr. 603–04, 637 (Simmons describing the IBB's checks-and-balances structure).

[6] *See* 12 Trial Tr. 2832 (Newman testifying that investigators reviewed the purposes written on receipts or in Expensify); 3 Trial Tr. 161–62 (Simmons explaining the two-signature countersign process).

[7] *See* 10 Trial Tr. 2069–70 (Stapp identifying Exhibit 298 and the approval of the vacation payout by Dan McWhirter).

[8] *See* 4 Trial Tr. 349–52 (Simmons describing the Article 17 proceeding and hearing transcript); 4 Trial Tr. 378–81 (Simmons confirming the binding decision removing Jones); 5 Trial Tr. 594 (Simmons testifying that, based on the IEC decision, the union retained Withum).

[9] *See* 4 Trial Tr. 291–96 (Simmons identifying the Blake & Uhlig legal memorandum and its LMRDA references).

Third, the financial infrastructure was IBB's. The challenged transactions ran through IBB credit cards, the Great Plains general ledger, Legacy Professionals audits, public LM-2 filings, IRS Form 990 filings, and ordinary union records.[10] The government proved no secret bank accounts, hidden funds, fake invoices, burner phones, or separate financial machinery.[11] Public accounting through union systems is the opposite of a separate enterprise.

Fourth, the objectives were IBB's. The alleged conduct involved union travel, union conferences, union expenses, union compensation, union relocation, union legal work, and union investments, including Bank of Labor matters approved through union channels. The travel evidence addressed union labor, organizing, and industrial policy issues.[12] The Bank

---

[10] *See* 10 Trial Tr. 2194–96 (Bathory testifying about Great Plains and Micro Force); 3 Trial Tr. 122 (Simmons testifying that annual LM-2 reports are filed with the Department of Labor and are public knowledge); 15 Trial Tr. 3504, 3513–14 (Welsh testifying about audit procedures and testing); 15 Trial Tr. 3513–15 (Welsh testifying about annual audits); 15 Trial Tr. 3513, 3515–16 (Welsh addressing Form 990 disclosures); 12 Trial Tr. 2718–19, 2839 (Newman addressing raw American Express data obtained by subpoena).

[11] *See* 11 Trial Tr. 2331–34 (Stojak testifying that she did not find secret bank accounts, was not told of secret books or code, and did not participate in the later criminal investigation); 12 Trial Tr. 2726–27 (Newman testifying that the investigation uncovered no burner phones, or secret bank accounts); 12 Trial Tr. 2822 (Newman testifying that investigators found no secret accounts in Creeden's name, no hidden union funds, no transfers to hide funds, and no fake invoices).

[12] *See* 12 Trial Tr. 2696, 2740–42 (Newman addressing the travel evidence, while not conceding the boilermaker-jobs link); 5 Trial Tr. 765, 814, 819 (Fairley addressing the TSSA trip and related union-business issues).

18

evidence addressed a union-affiliated financial institution and union financial strategy.[13] The government may dispute whether those decisions were sound, necessary, or properly authorized. But it proved institutional subjects pursued through institutional means.

That record does not establish a distinct enterprise. It establishes IBB personnel doing IBB business through IBB offices, IBB authority, IBB systems, and IBB objectives.

### B.    The government did not prove an agreement.

Count 1 fails for a third, independent reason: the government did not prove an agreement. It proved parallel institutional conduct. Union officers performed their own institutional functions, side by side, through the IBB's own channels. That is the appearance of a conspiracy, not the fact of one. Rule 29 requires the fact.

### 1.    The law requires agreement.

Agreement is the element. Conspiracy is "an agreement to commit an unlawful act," and agreement is the "essence" of the offense. *Iannelli v. United States*, 420 U.S. 770, 777 (1975). RICO conspiracy is no exception. Section 1962(d) eliminated the overt-act requirement, but it did not eliminate the agreement requirement. *Salinas v. United States*, 522 U.S. 52, 63, 65 (1997). The government therefore had to prove that Mr. Creeden joined an agreement to further or facilitate the charged criminal endeavor—not merely that he

---

[13] *See* 13 Trial Tr. 2932 (McCall testifying that the IBB owned approximately 58 to 59 percent of Bank of Labor Bankshares); 13 Trial Tr. 3054–56 (McCall addressing the Bank's investment forum and labor-deposit leverage theme); 14 Trial Tr. 3146–47 (McCall addressing Bank marketing and deposits); 14 Trial Tr. 3145–46 (McCall testifying that the Washington, D.C. office arguably created value).

worked in the same organization, followed the same institutional channels, or performed a role that later appeared in the government's narrative. *See id.* at 65.

The Tenth Circuit states the requirement plainly. The government must prove "that two or more persons agreed to violate the law," that the defendant knew the conspiracy's essential objectives, and that he knowingly and voluntarily joined it. *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009). Those requirements matter here. Agreement is not a formality the government may assume from office, association, or the indictment. It is the thing the government had to prove beyond a reasonable doubt.

### 2.    Circumstantial proof still must prove agreement.

Agreement may be proved by circumstantial evidence. But the inference must prove agreement, not merely association. *See United States v. Wardell*, 591 F.3d 1279, 1288-91 (10th Cir. 2009). The circumstances must be "of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists." Id. In the RICO setting, the government must prove that each defendant joined the enterprise knowing of and agreeing to its criminal objectives. *United States v. Kamahele*, 748 F.3d 984, 1006–07 (10th Cir. 2014).

### 3.    Parallel conduct does not prove agreement.

Parallel conduct is not agreement. A single conspiracy requires a shared criminal objective, not merely similar or parallel objectives among similarly situated people. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). Knowledge that another person may be acting unlawfully is not enough; conspiracy requires intent to further, promote, and

cooperate in the unlawful venture. *Direct Sales Co. v. United States*, 319 U.S. 703, 711–13 (1943). Conduct equally consistent with a lawful institutional explanation does not prove a meeting of the minds. *See United States v. Evans*, 970 F.2d 663, 673 (10th Cir. 1992).

That distinction controls this record. People inside the same organization often act in parallel because the organization gives them common rules, channels, and roles. Officers follow the same constitution. Employees use the same forms. Accounting personnel process the same categories of expenses. Board members attend the same meetings. Subordinates implement the same superior's decisions. That evidence may show hierarchy, proximity, or ordinary administration. It does not show a criminal agreement.

### 4.    The record shows role performance.

The government proved role performance, not agreement. Jones approved expenditures. Mr. Creeden processed expenditures. Others traveled and spent. Accounting recorded transactions. HR administered personnel decisions. Each person performed an assigned role through the IBB's ordinary machinery. The principal thread connecting that conduct was the IBB Constitution and the IEC approval structure it created. The government's own theory depended on that structure: expenditures moved through the President and the IEC, not through a separate criminal compact. Coordinated institutional function is not a criminal agreement.

###### 5.    The witnesses did not supply the agreement.

The government's witnesses confirmed the gap. Newman did not investigate the agreement at all.[14] Nor did the investigation uncover any markers of a hidden compact.[15] Fairley admitted that no separate enterprise existed,[16] and Brown said the same thing.[17]

What remains is an invitation to infer agreement from shared employment and parallel activity. That inference cannot sustain Count 1. The government proved that union officers did union jobs at the same time through union channels. It did not prove that Mr. Creeden agreed to join the charged RICO conspiracy.

---

[14] *See* 12 Trial Tr. 2807–08 (Newman testifying that the agreement element was "not anything I thought about" and that he "was focused more on the finances").

[15] *See* 11 Trial Tr. 2334 (Stojak found no second set of books or secret codes); 12 Trial Tr. 2726–27 (Newman testifying that the investigation uncovered no burner phones, hidden bank accounts, or pooling accounts); 13 Trial Tr. 2868–69 (Newman testifying that investigators used no wiretaps or pen registers and did not analyze phone records).

[16] *See* 6 Trial Tr. 947–48 (Fairley testifying that there was no conversation or agreement to join a conspiracy); 6 Trial Tr. 1028 (Fairley testifying that no defendant wrote down or discussed an acknowledgment of a criminal enterprise or conspiracy).

[17] *See* 8 Trial Tr. 1450 (Brown testifying that there was "no agreement to become a racketeer"); 8 Trial Tr. 1451 (Brown testifying that there were no emails or texts); 8 Trial Tr. 1456 (Brown testifying, "we never agreed amongst ourselves of any criminal act").

## C.      The government did not prove *one* RICO conspiracy.

Count 1 also fails because the government did not prove the single RICO conspiracy it charged. The law required proof that Mr. Creeden knowingly joined *one integrated conspiracy*, not merely that separate people dealt with Newton Jones on separate subjects. A common hub is not enough. The government had to prove a rim and it never did.

### 1.      The law requires a connected conspiracy.

*Kotteakos v. United States*, 328 U.S. 750 (1946), gives the controlling principle. Separate spokes do not become one conspiracy merely because they connect to the same central figure. Id. at 755. The Tenth Circuit applies the same rule. A single conspiracy does not exist "solely because many individuals deal with a common central player"; the alleged conspirators "must be interconnected in some way." *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992). The defendant's conduct must facilitate the endeavors of other alleged conspirators or the venture as a whole. *Id.* at 670–71.

That requirement is decisive here. The government had to prove that Mr. Creeden knowingly joined a conspiracy of that magnitude, not merely that he participated in some narrower transaction. *See United States v. Carnagie*, 533 F.3d 1231, 1239–41 (10th Cir. 2008). Similar or parallel conduct among similarly situated people does not suffice. A single conspiracy requires a shared criminal objective, not merely similar objectives around a common actor. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005).

23

The RICO-enterprise setting does not lower that burden. *Tronsgard v. FBL Financial Group, Inc.*, 312 F. Supp. 3d 982 (D. Kan. 2018), applies the same hub-and-spoke principle to an alleged association-in-fact enterprise. A rimless theory cannot establish the charged enterprise conspiracy without facts showing relationships, agreements, or collaborative communications among the spokes. *Id.* at 1000–01.

### 2.    The proof showed separate spokes.

The proof did not show a rim. It showed separate Newton Jones-centered allegations: family benefits, vacation payouts, forensic surveillance, and Bank of Labor issues. Those allegations had different participants, different mechanics, different records, and different supposed objectives. Only the Bank of Labor spoke involved Mr. Creeden with any directness, and those moved through formal union and Bank channels.[18] That does not make him part of every other spoke. Mr. Creeden never knowingly joined one integrated RICO conspiracy extending across all charged subjects.

### 3.    The Bank evidence did not create one conspiracy.

The Bank of Labor evidence did not fill the gap. Even if that evidence showed some Bank-related involvement by Mr. Creeden, it did not prove that he agreed to family wage, healthcare, vacation, office-administration, restaurant-expense, relocation, or surveillance allegations. The family-benefits spoke ran through Jones, his family, and Stapp. The

---

[18] *See* 6 Trial Tr. 878 (Fairley addressing the IEC resolution and Creeden's Bank role as Executive Vice President); 14 Trial Tr. 3149, 3151 (McCall addressing board review and bonus approval); 13 Trial Tr. 3038 (McCall addressing the outside-consultant point).

vacation-payout spoke ran through Jones and Stapp. The Bank of Labor spoke involved Jones and Mr. Creeden. The spokes did not depend on each other. They did not advance each other. They did not show one shared criminal objective.

That is the failure of interdependence. The government proved proximity to Newton Jones. It proved participation in ordinary IBB governance. It proved, at most, discrete allegations connected to a common superior. It did not prove a rim connecting those allegations into one conspiracy.

Count 1 therefore fails for a separate reason. The government did not prove one RICO conspiracy.

## II.    Count 48 warrants a judgment of acquittal.

Count 48 charged Mr. Creeden under 29 U.S.C. § 501(c) with embezzling $7,000,000 from the Boilermakers' MORE Work Investment Fund through allegedly unauthorized loans to the Bank of Labor. Doc. 1 at 44; *see generally Lawson v. United States*, 300 F.2d 252, 254 (10th Cir. 1962); *United States v. Davila*, 693 F.2d 1006, 1007 (10th Cir. 1982); *United States v. Oldbear*, 568 F.3d 814, 822–23 (10th Cir. 2009). The proof failed at every level. The government proved no unauthorized appropriation, no deprivation of union value, no conversion to Mr. Creeden's use, and no fraudulent intent. Count 48 therefore rests on a fiduciary and governance theory—not proof of criminal embezzlement.

**A.      The government did not prove an unauthorized appropriation.**

Count 48 fails because § 501(c) required an unauthorized appropriation. The indictment charged Mr. Creeden with embezzling $7,000,000 from the MORE Work Investment Fund through unauthorized Bank of Labor loans. Doc. 1 at 44. The government therefore had to prove lack of authorization. But the record showed the opposite—that the loan at issue was fully authorized by the IEC that Mr. Creeden had no vote on.

**1.      Section 501(c) requires lack of authorization.**

Authorization is not a side issue. It is an element. *United States v. DeFries*, 129 F.3d 1293, 1306–07 (D.C. Cir. 1997), holds that § 501(c) "requires the unauthorized appropriation of union property" and that lack of authorization is "a distinct element of the offense." *Id.* The reason is straightforward: "[I]t does not make any sense to say that a union officer can embezzle, steal, or convert property he is authorized to take." *Id.*

**2.      The IEC authorized the loan.**

The government never proved beyond a reasonable doubt that this $7 million transaction lacked IBB authorization. On the contrary, and though it was not his burden to do so, Mr. Creeden harnessed evidence showing that every material aspect of the $7 million MORE Fund loan was in fact authorized. Doc. 1 at 44.

Specifically, the Exhibit 1084 IEC minutes conclusively show IBB authorization for lending to the Bank of Labor up to $20 million.  With full deliberative consideration, the IEC (that Mr. Creeden is not a member of) authorized the transaction "by majority vote":

> President Jones discussed the prospect of the International Brotherhood increasing its investment in the Brotherhood Bank. In this regard, he noted that the bank was confronting a tight money market in which the ability to obtain funding from other banks for lending purposes is limited. He proposed the prospect of the International Brotherhood working out an agreement to extend a line of credit to the bank of International funds of as much as $20 million which could be beneficial for both the union and the bank. He inquired of General Counsel Moreland as to the legality of such an arrangement. General Counsel Moreland advised that there was no legal constraint requiring consideration of such a transaction, unlike any other investment. The issues, he said, are the fiduciary issues which must be considered by the International Executive Council in making any investment of union funds. If due diligence is exercised and such an investment is a prudent use of union funds, then it stands on the same basis as any other investment.
>
> IVP McManamon moved that the International President and the International Secretary-Treasurer be authorized to negotiate with Brotherhood Bank & Trust the terms and conditions for extending to the bank a $20 million line of credit, the International President and International Secretary-Treasurer retaining authority to condition and guide the use of any funds so extended. IVP Power seconded the motion. Motion carried by majority vote.

Ex. 1084 at 2. [19] (Mr. Creeden was *not* part of the IEC,[20] keeping all of these decisions fully independent.). The charged $7 million fell within that IBB authorization.

### 3. The government's loan-label argument does not create unauthorized appropriation.

The government cannot save Count 48 by drawing a sharp line between a "loan" and a "line of credit." As the argument goes, the IEC authorized only a "line of credit," while the charged $7 million "loan" was wholly different. That hairsplitting distinction matters only if it proves the transaction fell outside the IEC's authorization. It does not.

---

[19] *See* 4 Trial Tr. 499–500 (Simmons identifying Exhibit 1084 as the December 6, 2009 IEC minutes authorizing a line of credit to the Bank of Labor up to $20 million); 6 Trial Tr. 879–82 (Fairley addressing the same $20 million authorization).

[20] *See* 3 Trial Tr. 133 (Simmons confirming that the IST is not part of the IEC); 3 Trial Tr. 160.

The government needed a sharp distinction. Yet its own witness denied one. McCall described the instrument as a hybrid.[21] He confirmed that a "line of credit" is a type of "loan," that a line of credit and a standard loan are both loans, and that the terms are sometimes "used interchangeably." [22]

McCall's testimony equating a "loan" and "line of credit" ends the inquiry. At best for Mr. Creeden, the testimony establishes that the $7 million transaction fell squarely within the IEC's authorization to extend credit to the Bank. At worst, it creates reasonable doubt about whether the transaction exceeded that authorization. Either way, Count 48 cannot stand. A conviction cannot rest on a distinction the government's own witness treated as hybrid, overlapping, and interchangeable.

### 4.    The Bank board approved the loan too.

The Bank board also approved the transaction. Government Exhibit 180 contains the board minutes approving the loan. [23] McCall confirmed that those were the Bank board

---

[21] *See* 13 Trial Tr. 3005–06 (McCall testifying that the $7 million transaction combined preset loan terms with a revolving draw feature).

[22] *See* 13 Trial Tr. 3003–04 (McCall testifying that a line of credit is "a type of loan" with a revolving feature); 13 Trial Tr. 3005 (McCall confirming that a line of credit and standard loan are both loans); 13 Trial Tr. 3006 (McCall acknowledging that financial institutions sometimes use "loan" and "line of credit" interchangeably).

[23] *See* 13 Trial Tr. 2990–91 (McCall testifying that the Bank of Labor board reviewed and approved the loan transaction and that the approval was captured in the board minutes).

minutes approving the loan. The motion was made, seconded, and carried unanimously, with Jones, Creeden, and Fairley abstaining[24]:

> President Bob McCall reviewed the IBB Loan Resolution to provide <mark>additional capital</mark> to the bank and keep the leverage ratio at 7% or above. He noted the Boilermakers have been kind enough to provide the Bank with a loan. The loan amount is up to $7MM plus accrued but unpaid interest, consisting of the $2MM outstanding balance from the 2015 loan plus up to $5MM additional; provided that such loan amount may be increased to the extent Lender has sufficient liquidity and subject to Lender approval. The interest rate is WSJ Prime rate plus 1.25% with a floor of 4.5%. Interest only, payable monthly for a term of 10 years. Pledge of 100% of Bank of Labor stock. After a discussion, Mr. Rick Worner moved to approve the loan and Resolution with additional floating rate language added. Mr. Mike Langford seconded; the motion carried unanimously with Newton Jones, Bill Creeden, Warren Fairley, and Mike Stapp abstaining from the vote.

Ex. 180 at 14 (aka Ex. 180a) (emphasis in original).

That approval matters. Count 48 charged an unauthorized loan. But the record showed authorization from both sides of the transaction: the union-side IEC authorization and the Bank-side board approval. The government did not prove an unauthorized appropriation. It proved an approved transaction. Count 48 fails on that element alone.

### B.      The government did not prove deprivation of value.

Count 48 also fails because the government did not prove that the IBB was deprived of value. Section 501(c) is a theft statute. Its verbs—embezzle, steal, abstract, and convert—require proof that union property was wrongfully taken. *See* 29 U.S.C. § 501(c). A union officer does not embezzle union property merely because union money is placed into an approved, documented, value-for-value transaction.

---

[24] *See* 13 Trial Tr. 2991 (McCall confirming from the board minutes that Jones and Creeden abstained from the vote); 13 Trial Tr. 3017 (McCall explaining that the abstentions reflected the perceived conflict issue created by dual Bank and union roles).

### 1.    Section 501(c) requires a deprivation of union value.

The deprivation requirement follows from the statute's theft language. Section 501(c) punishes the wrongful taking or conversion of union assets. It does not punish a transaction merely because the government later disputes its wisdom. *United States v. DeFries*, 129 F.3d 1293, 1307 (D.C. Cir. 1997), makes the same point from the authorization angle: "it does not make any sense to say that a union officer can embezzle, steal, or convert property he is authorized to take." *Id.* at 1307. The same logic applies to value. It does not make sense to say a union officer stole $7 million when the union received a documented repayment obligation and then received repayment with interest.

### 2.    The loan exchanged money for an enforceable repayment right.

The charged transaction did not strip the IBB of $7 million. It exchanged cash for a loan asset: the Bank of Labor's obligation to repay principal with interest. A theft theory requires deprivation. A loan creates a receivable. It does not become a criminal taking merely because prosecutors later criticize the investment decision.

The government therefore had to prove that the movement deprived the union of value. Yet the record showed a documented loan, made through institutional channels, supported by board approval, and carried as an obligation to repay. McCall confirmed the

30

transaction's basic economics: the Bank borrowed money, owed interest, and paid the loan back.[25] Other witnesses confirmed the same value-for-value exchange.[26]

That is not the kind of deprivation that Section 501(c) criminalizes. It is a fully normal investment transaction that does not constitute embezzlement.

### 3.    The union received repayment with interest.

The repayment evidence further defeats the deprivation theory. This wasn't just a value-for-value transaction in theory at inception.  It actually worked out that way. In fact, the transaction played out to everyone's mutual benefit with the union receiving back its principal plus interest.[27] The government proved no unpaid balance, no unrecovered principal, no write-off, no hidden diversion, and no transaction in which the Bank simply kept union money.[28]

---

[25] *See* 13 Trial Tr. 3003–06, 3076–77 (McCall testifying that the transaction was structured as a loan with interest and that the Bank repaid the union with interest).

[26] *See* 16 Trial Tr. 3745 (Gaia testifying that the union loaned money to the holding company); 16 Trial Tr. 3746 (Gaia testifying that the Bank repaid the loans with interest); 11 Trial Tr. 2326 (Stojak confirming that interest earned on the Bank loans was recorded as income on the union's LM-2 reports).

[27] *See* 16 Trial Tr. 3746 (Gaia testifying that the Bank repaid the loans with interest and addressing the $7 million transaction); 13 Trial Tr. 3075–76 (McCall testifying about the 7 percent/prime interest structure); 11 Trial Tr. 2326 (Stojak confirming that interest on the IBB's Bank loans was recorded as income on Line 40 of the union's LM-2 reports).

[28] *See* 11 Trial Tr. 2331–34 (Stojak testifying that she found no secret bank accounts, was not told of secret books or code, and did not participate in the later criminal investigation); 12 Trial Tr. 2822 (Newman testifying that investigators found no secret accounts in Creeden's name, no hidden union funds, no transfers to hide funds, and no fake invoices).

31

That record cannot sustain Count 48. The $7 million did not disappear. It came back with a return. Risk does not become deprivation without a loss, diversion, or uncompensated taking. The evidence proved the opposite: an approved institutional loan, a repayment obligation, repayment of principal, and payment of interest. Count 48 fails for that independent reason.

### C.    The government did not prove conversion to Mr. Creeden's own use.

Count 48 also fails because § 501(c) required proof that Mr. Creeden converted union property to his own use or the use of another. 29 U.S.C. § 501(c). The government did not prove that element. It proved a union-authorized loan to a union-affiliated banking institution, followed by repayment with interest.

### 1.    Section 501(c) requires conversion *to a prohibited use*.

Section 501(c) does not punish every disputed movement of union money. It punishes embezzlement, stealing, unlawful abstraction, and conversion of union property "to [the defendant's] own use or the use of another." 29 U.S.C. § 501(c). The government thus had to prove more than a loan it later disliked. It had to prove that the charged defendant wrongfully exercised dominion over union property and diverted it to "his or her own use." Doc. 447 at 25 (Instruction No. 28).[29]

---

[29] The Government's failure to object to element #1 was a waiver and forfeiture of the "use of another" theory, and because the defendants relied on the government's election of theories in making their closing arguments, it should be estopped from arguing to the

### 2. The government proved no personal benefit to Mr. Creeden.

Whatever fiduciary criticism the government may level at the transaction, it did not prove the theft-like use that § 501(c) requires. No evidence showed that Mr. Creeden or Mr. Jones received a fee, commission, kickback, distribution, bonus, or other personal benefit from the MORE Fund loan. Neither received the $7 million. Neither controlled it for personal use. Neither routed it through a personal entity.

On the contrary, proof showed that the loan worked just as both sides had intended. The money went to the Bank structure and came back to the IBB.[30] The record showed no diversion, no off-books movement, no fake invoices, and no concealed books.[31] It showed instead only a capital-support transaction for the union's own banking investment, repaid with interest reported as union income.[32]

---

contrary. *See Iverson*, 818 F.3d at 1027 n.5. But the Court need not reach that point because the government failed to meet its burden under either theory.

[30] *See* 16 Trial Tr. 3745 (Gaia testifying that the union loaned money to Bankshares, which carried the debt and downstreamed cash into the Bank); 13 Trial Tr. 2989 (McCall testifying that the Bank drew the $7 million in two tranches); 13 Trial Tr. 3076 (McCall testifying that the Bank borrowed the money for capital needs and to maintain its capital-to-asset ratio).

[31] *See* 11 Trial Tr. 2331–34 (Stojak testifying that she found no secret bank accounts, was not told of secret books or code, and did not participate in the later criminal investigation); 12 Trial Tr. 2822 (Newman testifying that investigators found no secret accounts in Creeden's name, no hidden union funds, no transfers to hide funds, and no fake invoices).

[32] *See* 13 Trial Tr. 3076–77 (McCall testifying that the $7 million transaction was repaid with interest); 16 Trial Tr. 3746 (Gaia testifying that the Bank repaid the union loans with interest); 11 Trial Tr. 2326 (Stojak confirming that interest earned on the Bank loans was recorded as income on Line 40 of the union's LM-2 reports).

33

That proof does not establish conversion to Mr. Creeden's own use or the use of another. It establishes an approved institutional loan, no personal benefit, no diversion, and repayment with interest—everything except the theft-like use § 501(c) requires.

### D.    The government did not prove fraudulent intent.

Count 48 also fails because § 501(c) required proof of willful fraudulent intent. *United States v. Long*, 952 F.2d 1520, 1524 (8th Cir. 1991). The government did not prove that Mr. Creeden acted *with a bad purpose* to steal or convert union money. It proved an open, documented, approved, and repaid transaction.

### 1.    Section 501(c) requires criminal intent.

Fraudulent intent is not supplied by a later disagreement over governance. Section 501(c) is a criminal statute. It does not convert every negligent, accidental, or innocent fiduciary breach into a felony. *See United States v.* Durnin, 632 F.2d 1297, 1299 & n.6 (5th Cir. 1980). The government had to prove that Mr. Creeden acted with criminal intent, not merely that the transaction could be criticized after the fact.

A transaction can be imperfectly documented, disputed, or criticized without becoming embezzlement. The intent question turns on what the proof showed about Mr. Creeden's state of mind. The proof did not show concealment, personal enrichment, loss, or any bad purpose to deprive the union of money.

34

### 2.    Mr. Creeden abstained from the Bank board vote.

Mr. Creeden's abstention defeats the government's intent theory. The evidence showed that Jones, Creeden, and Fairley abstained from the Bank board vote because the matter presented a perceived conflict issue.[33] The remaining members approved the deal.[34]

That is not how fraudulent intent normally looks. Abstention is not concealment. It is not a secret taking. It is not an effort to force a conflicted vote through the Bank board. It shows that Mr. Creeden recognized the governance sensitivity and left approval to independent decisionmakers.

### 3.    The transaction was open and documented.

The transaction also lacked the markers of criminal intent. The government proved no secret bank account, hidden fund, fake invoice, burner phone, concealed payment channel, or side agreement.[35] The MORE Fund transaction ran through institutional

---

[33] *See* 13 Trial Tr. 2990–91 (McCall testifying that the Bank of Labor board reviewed and approved the loan transaction, identifying Government Exhibit 180-A as the official board minutes, and confirming that Jones and Creeden abstained from the vote); 13 Trial Tr. 3017 (McCall testifying that the interested union officers abstained because they may have perceived a conflict issue); 6 Trial Tr. 886 (Fairley addressing the abstentions).

[34] *See* 6 Trial Tr. 886 (Fairley testifying that the loan resolution was moved by Worner, seconded by Langford, and carried unanimously among the remaining Bank board members).

[35] *See* 12 Trial Tr. 2822 (Newman testifying that investigators found no secret accounts in Creeden's name, no hidden union funds, no transfers to hide funds, and no fake invoices); 12 Trial Tr. 2727, 2839 (Newman testifying that the investigation used existing subpoenaed records, including raw American Express data); 11 Trial Tr. 2331–34 (Stojak testifying that she found no secret bank accounts and was not told of secret books or code).

records, accounting systems, audited financial statements, public reporting, and regulatory review.[36]

Fraudulent intent ordinarily leaves a trail of concealment or personal extraction. The government proved neither.

### 4.    The loan returned value to the union.

The repayment evidence also undercuts intent. The loan was repaid with interest. The union received its principal back plus a return. The Bank remained a regulated institution, and the capital support was reviewed in that context.

That does not prove a bad-purpose taking. It proves the opposite. A defendant who intends to steal union money does not structure an approved institutional loan, route it through records, abstain from conflicted approval, and return the money with interest.

At most, the government alleged an internal governance defect. That is not enough. A negligent, accidental, or innocent breach of fiduciary duty may create civil consequences, but it does not violate § 501(c) without criminal intent. *Durnin*, 632 F.2d at 1299. The

---

[36] *See* 10 Trial Tr. 2194–96 (Bathory testifying that the union used Great Plains and Micro Force); 16 Trial Tr. 3745 (Gaia testifying about the Bank loans as recorded on the union's books); 15 Trial Tr. 3513–15 (Welsh testifying about annual audits); 15 Trial Tr. 3504, 3513–14 (Welsh testifying about audit procedures and testing); 3 Trial Tr. 122 (Simmons testifying that the union filed annual public LM-2 reports with the Department of Labor); 11 Trial Tr. 2326 (Stojak confirming that interest earned on the Bank loans was reported as income on the union's LM-2 reports); 15 Trial Tr. 3515–16 (Welsh addressing Form 990 disclosures).

government proved no bad purpose, no concealment, no personal enrichment, no loss, and no intent to deprive the union of funds. Count 48 fails on fraudulent intent as well.

## III.    Count 53 warrants a judgment of acquittal.

Count 53 alleged wire fraud against the Bank of Labor. Tt fails at every step. The government proved an open compensation arrangement approved by the Bank's own board, reviewed by the Bank, and left in place—not a deceptive scheme that obtained Bank property.

### A.    The government proved no deception.

Count 53 fails first because wire fraud requires deception. The government had to prove a scheme or artifice to defraud, not merely an arrangement it now criticizes. Wire fraud requires deception and a money-or-property object. *Kousisis v. United States*, 605 U.S. 114, 121-125 (2025). A scheme to defraud must be "reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Drake*, 932 F.2d 861, 864 (10th Cir. 1991). The false-pretenses clause requires "particular false pretenses, representations or promises." *United States v. Cochran*, 109 F.3d 660, 664 (10th Cir. 1997).

#### 1.    Wire fraud requires a deceptive act.

The deception requirement matters here. The government could not convict Mr. Creeden by proving that the Bank compensation arrangement was debatable, unusual, or vulnerable to criticism. It had to prove that Mr. Creeden used a false statement, false pretense, or deceptive act to obtain Bank money.

The government did not identify that act. It proved no false timesheet, no Bank-hours certification, no full-time representation, and no statement by Mr. Creeden that caused any Bank decisionmaker to approve compensation. The "two full-time jobs" phrase is rhetoric. It is not deception.

### 2.    Payroll processing did not induce the compensation.

Payroll processing did not supply deception. The Bank had already approved the position and compensation structure before payroll processed compensation.[37] They did not induce the Bank's decision.

Nor did the payroll records represent that Mr. Creeden worked some certified number of Bank hours. Bank officers were salaried executives. They did not log or report hours.[38] McCall rejected the premise that the 80-hour notation fairly showed payroll fraud. The payroll records also did not claim that Mr. Creeden had no IBB role.[39]

---

[37] *See* 13 Trial Tr. 2977–78 (McCall testifying about the compensation committee and board approval process); 13 Trial Tr. 3075 (McCall addressing board approval of compensation including change-of-control/golden-parachute terms); 13 Trial Tr. 3108–10 (McCall addressing admission of Exhibit 3012, the salary-allocation memo).

[38] *See* 13 Trial Tr. 3117–18 (McCall testifying that officers do not log hours and addressing the 80-hour ADP convention); 14 Trial Tr. 3165–66 (McCall identifying Dayforce as the payroll vendor); 14 Trial Tr. 3199 (Elder addressing biweekly payroll through Dayforce ACH); 13 Trial Tr. 3118 (McCall testifying that it would not be fair to call the payroll fraudulent).

[39] *See* 15 Trial Tr. 3515–16 (Welsh testifying that the dual salaries appeared on Form 990 filings); 11 Trial Tr. 2337–38 (Stojak testifying that tax returns disclosed the dual employment); 15 Trial Tr. 3514–15 (Welsh testifying that clean audit opinions were issued).

That distinction is decisive. Wire fraud punishes deceptive schemes that obtain money. It does not punish routine payroll implementation after the decisionmaker has already approved the compensation.

### 3. The Bank knew Mr. Creeden's IBB role.

Nor did the government prove institutional ignorance. Bank materials identified his IBB role. The Bank board approved his Bank role.[40] The Bank set his compensation, reviewed the arrangement, voted bonuses, and continued the arrangement.[41] The Bank's regulators knew too.[42] The arrangement was also publicly disclosed.[43]

A disclosed role cannot be the hidden fact that makes a scheme fraudulent. The arrangement was not hidden from the Bank. It was the Bank's own arrangement.

---

[40] *See* 13 Trial Tr. 3113 (McCall testifying that Ruiz nominated Jones as executive officer and Creeden as EVP by unanimous vote); 14 Trial Tr. 3184–85 (Elder addressing the board appointment of Creeden as EVP).

[41] *See* 13 Trial Tr. 2977–78 (McCall testifying about the compensation committee and board approval process); 13 Trial Tr. 2930 (McCall addressing bonuses and phantom stock); 14 Trial Tr. 3149–51 (McCall testifying that independent board members evaluated and voted on bonuses).

[42] *See* 13 Trial Tr. 2948, 2980 (McCall identifying the FDIC Report of Examination and the labor-strategy role reflected there); 13 Trial Tr. 2977 (McCall testifying about Creeden's EVP title and salary); 14 Trial Tr. 3137–38 (McCall testifying that an FDIC inquiry occurred and the arrangement did not change); 14 Trial Tr. 3148–49 (McCall addressing regulatory awareness).

[43] *See* 15 Trial Tr. 3515–16 (Welsh testifying that dual salaries appeared on Form 990 filings).

39

### B.    The government proved no decisional influence.

Count 53 also fails because the government proved no material deception capable of influencing the relevant decisionmaker. Materiality requires a statement capable of influencing the relevant decision. *Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Gaudin*, 515 U.S. 506, 509 (1995). A fact already known to the decisionmaker cannot materially influence that decisionmaker through deception.

The relevant decisionmaker here was the Bank, and it knew everything material. The Bank knew Mr. Creeden's IBB role[44] and approved it.[45] It set his compensation.[46] It reviewed the arrangement and continued it.[47] It changed nothing after scrutiny.[48] That record defeats materiality.

---

[44] *See* 14 Trial Tr. 3148–49 (Bank materials identifying Creeden as International Secretary-Treasurer); 15 Trial Tr. 3515–16 (Welsh testifying that dual salaries appeared on Form 990 filings).

[45] *See* 13 Trial Tr. 3113 (McCall addressing Ruiz's nomination of Jones as executive officer and Creeden as EVP); 14 Trial Tr. 3184–85 (Elder addressing the board appointment of Creeden as EVP).

[46] *See* 13 Trial Tr. 2977–79 (McCall testifying that compensation was established and approved by the board); 13 Trial Tr. 3108–10 (McCall addressing the salary-allocation memo); 13 Trial Tr. 2977–78 (McCall testifying about the compensation committee process).

[47] *See* 14 Trial Tr. 3149–50 (McCall testifying about independent board review and bonuses); 13 Trial Tr. 2930 (McCall addressing compensation-committee bonuses and phantom stock); 14 Trial Tr. 3168 (McCall addressing audit-committee review of compensation structures).

[48] *See* 14 Trial Tr. 3137 (McCall testifying about the FDIC inquiry and no resulting change).

### C.     The government proved no money-or-property object.

Count 53 independently fails because wire fraud protects money and property, not generalized interests in disclosure, good governance, conflict management, or regulatory compliance. Federal fraud statutes are not roving good-government codes.

### 1.     Wire fraud requires money or property as the object.

The Supreme Court has repeatedly enforced that boundary. Federal fraud statutes protect property, not generalized interests in honest administration or regulatory compliance. *McNally v. United States*, 483 U.S. 350, 356, 360 (1987); *Kelly v. United States*, 590 U.S. 391, 398–404 (2020); *Ciminelli v. United States*, 598 U.S. 306, 315–17 (2023). Deception and the money-or-property requirement are independent elements. *Kousisis v. United States*, 605 U.S. 114, 121–25 (2025). And absent an honest-services charge, *Skilling v. United States*, 561 U.S. 358, 408–11 (2010), forecloses converting conflict-of-interest theories into federal fraud.

That rule decides the LM-30 and Conflict Policy theories. Those theories concern disclosure, conflicts, and governance. They are not Bank property. They did not control the Bank's appointment decision, compensation decision, payroll process, or property disposition. The compensation itself was Bank property. But the Bank's own board and its Compensation Committee made the key initial decisions independently.[49] The Bank also

---

[49] *See* 13 Trial Tr. 2977–78 (McCall testifying that the Bank board and Compensation Committee approved Jones's and Creeden's compensation); 13 Trial Tr. 3113 (McCall testifying that Ruiz nominated Jones as executive officer and Creeden as executive vice president and that the motion carried unanimously); 14 Trial Tr. 3184–85 (Elder testifying

went on to independently decide bonuses, review the arrangement, and leave it in place.[50]

Even after public and regulatory scrutiny, the Bank opted to change nothing.[51]

That is not a defendant taking Bank property by false pretenses. It is a Bank-approved compensation arrangement. The government did not prove deception that caused the Bank to part with money. It proved that the Bank decided to pay compensation and then did so. Count 53 fails.

### 2. The LM-30 and Conflict Policy theories are not property fraud.

The government tried to turn disclosure and conflict-management theories into Bank-property fraud. That move fails. A disclosure form sent to DOL is not Bank money. A union conflict policy is not Bank money. A governance norm is not Bank money. Count 53 required proof that Mr. Creeden obtained Bank money by deception. The government did not prove that by pointing to disclosure or conflict theories outside the Bank's compensation decision.

---

that Creeden served as a Bank board member and senior executive vice president and was appointed by the Bank board).

[50] *See* 14 Trial Tr. 3149–51 (McCall testifying that independent board members reviewed Creeden's performance, considered him valuable to the Bank, and recommended bonuses); 13 Trial Tr. 2930 (McCall addressing bonuses and phantom stock); 14 Trial Tr. 3168 (McCall addressing audit-committee review of compensation structures).

[51] *See* 14 Trial Tr. 3137–38 (McCall testifying that the FDIC inquiry included the IBB-Bank relationship, Creeden's EVP role, and Creeden's compensation, and that the matter was resolved with no change to Creeden's position or compensation); 14 Trial Tr. 3148–49 (McCall testifying that Creeden's IBB role was no secret to the FDIC and that the Bank board supervised management).

The conflict-policy theory also fails on its own terms. The Bank role was not concealed self-dealing; the IEC formally authorized the arrangement at the outset, including the President's Bank role and the appointment of Mr. Creeden as Senior Executive Vice President.[52] The relevant governance body disclosed, voted, and certified the arrangement at the highest level of the union. And when later Bank-related votes presented a potential conflict issue, Mr. Creeden abstained.[53] That record does not show deception of the Bank, deprivation of Bank property, or a hidden conflict scheme. It shows an institutional arrangement authorized through institutional governance.

Those theories may describe alleged regulatory or internal-policy issues. They do not establish wire fraud.

---

[52] *See* 6 Trial Tr. 878 (Fairley testifying that the IEC resolution authorized Jones to accept the Bank CEO role and authorized the CEO to appoint Creeden as executive vice president, subject to Bank board acceptance); 12 Trial Tr. 2823 (Newman acknowledging that the Executive Council authorized Creeden to have the Bank job); 13 Trial Tr. 3113 (McCall testifying that Ruiz nominated Creeden as executive vice president and that the motion carried unanimously); 14 Trial Tr. 3184–85 (Elder testifying that Creeden served as Bank senior executive vice president and was appointed by the Bank board).

[53] *See* 6 Trial Tr. 886 (Fairley testifying that Worner moved to approve the loan, Langford seconded, the motion carried unanimously, and Jones, Creeden, and Fairley abstained because of a perceived conflict issue); 13 Trial Tr. 2990–91 (McCall testifying that the Bank board reviewed and approved the loan transaction and that Jones and Creeden abstained from the vote); 13 Trial Tr. 3017 (McCall testifying that the abstentions reflected the perceived conflict issue created by dual Bank and union roles).

**IV.    Counts 2 through 48 warrant a judgment of acquittal.**

Counts 2 through 48 fail because the government did not prove lack of authorization. Count 48 independently fails for the reasons above. The same authorization defect runs through the remaining § 501(c) counts.

Section 501(c) punishes theft-like conduct: embezzlement, stealing, unlawful abstraction, and conversion. It does not punish a union officer for processing authorized expenditures. *United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997), states the rule: § 501(c) "requires the unauthorized appropriation of union property," and lack of authorization is "a distinct element of the offense." *Id.* at 1306–07.

Congress separated fiduciary governance from criminal theft. Section 501(a) imposes fiduciary duties. Section 501(b) gives members a civil remedy. Section 501(c) punishes theft-like conduct. A disputed approval, procedural defect, or alleged fiduciary breach may create civil governance issues. It is not embezzlement unless the government proves unauthorized appropriation and criminal intent.

The government pleaded Counts 2 through 48 as unauthorized expenditures. But it proved spending approved by the International President, the IEC, or ordinary union channels. Whatever the government may say about whether those approvals were wise, fair, or well documented, their existence defeats the authorization element as to Mr. Creeden. Authorized transactions are not embezzlement.

### A.    The government did not prove lack of authorization.

The burden was the government's. It had to prove affirmatively that the charged expenditures were not authorized. It did not.

The IBB Constitution gave the International President executive authority. Article 7.1.1 made him the principal executive and administrative officer, gave him day-to-day supervision over IBB affairs, and gave him authority to countersign payment orders and make expenditures necessary to protect the IBB's interests and achieve its objectives.[54] Article 7.2 gave him interpretive authority over the Constitution and subordinate-body bylaws, with his decisions binding unless reversed or modified by the IEC.[55]

The IEC supplied an independent authorization path. Article 5.2 gave the IEC authority over business and financial affairs and power to authorize expenditures deemed necessary to accomplish union objectives or benefit the union.[56] Article 5.8 allowed IEC

---

[54] *See* 3 Trial Tr. 164–65 (Simmons explaining Article 7.1 and the President's executive and administrative authority).

[55] *See* 3 Trial Tr. 159 (Simmons testifying that the President has authority to interpret the Constitution); 6 Trial Tr. 977 (Fairley testifying that the President has the right to interpret unless overturned by the Executive Council).

[56] *See* 3 Trial Tr. 166–67 (Simmons explaining Article 5.2 and the IEC's supervisory authority); 12 Trial Tr. 2823 (Newman acknowledging the council's authority); 4 Trial Tr. 476–79 (Simmons addressing Article 5.2 and the IEC/President hierarchy).

action outside formal session by letter, telephone, facsimile, email, or other means determined appropriate by the International President.[57]

Mr. Creeden's Article 9 role was different. It gave the Secretary-Treasurer finance-office duties: custody, income receipt, accounting, reporting, bill submission, payment, and recordkeeping.[58] It required him to pay warrants drawn on the treasury when properly countersigned by the International President and to submit bills to the International President for approval except routine, fixed, or recurring bills.[59] The Constitution placed substantive approval authority with the President and IEC.[60] It did not make the Secretary-Treasurer a one-person appellate body over both.

The Constitution confirms the point in an additional way. It expressly places the International Secretary-Treasurer "under the supervision of the International President." Ex. 3, IBB Const. art. 9.4, at 28. That is not the structure of a "number two" with coequal command authority. It is the structure of a finance officer who performs defined duties under the President's supervision and within the IEC's broader financial authority.

---

[57] *See* 3 Trial Tr. 206 (Simmons testifying that the IEC need not be assembled and may act by email); 4 Trial Tr. 462 (Simmons confirming IEC voting by email).

[58] *See* 3 Trial Tr. 160–62 (Simmons explaining Article 9.1 and the Secretary-Treasurer's finance-office duties).

[59] *See* 3 Trial Tr. 160 (Simmons explaining the Secretary-Treasurer's duty to pay expenses authorized by the President); 4 Trial Tr. 482–83 (Simmons addressing the Secretary-Treasurer's obligation to pay bills authorized by the President).

[60] *See* 4 Trial Tr. 471–72 (Simmons addressing the Secretary-Treasurer's duties regarding the President's expenses).

That structure matters. The government tried this case as if Newton Jones used approval authority wrongly. But if Jones or the IEC supplied approval, approval existed. Whether the approval was wise or faithful to fiduciary duty is not the § 501(c) question for Mr. Creeden. The question is whether the government proved an unauthorized appropriation by him. It did not.

## B.     The same authorization defect defeats the remaining § 501(c) counts.

The government's proof across the remaining § 501(c) counts followed the same pattern. Travel moved through assignment letters and regular expense channels. Expenses moved through IBB accounting. Compensation, relocation, vacation, legal-expense, and investment decisions moved through the President, the IEC, or ordinary institutional processes. That evidence does not prove unauthorized appropriation by Mr. Creeden.

Nor did the government prove that Mr. Creeden knowingly procured void approvals. It proved no secret accounts, hidden funds, fake invoices, or concealed payment channels. It proved an institutional system that made decisions through the President, IEC, accounting office, internal auditing office, HR, Great Plains, LM-2 reporting, and other ordinary records.

At minimum, if the IBB Constitution or policies were ambiguous, that ambiguity helps Mr. Creeden. The government cannot prove criminal intent by selecting the harshest after-the-fact reading of internal union governance and treating a contrary contemporaneous practice as theft.

47

**V.    Other important counts warrant a judgment of acquittal.**

**A.    Count 19 fails because the government proved neither principal liability nor aiding-and-abetting liability.**

Count 19 charged Mr. Jones and Mr. Creeden with embezzlement based on James O'Leary's travel to Rome and Paestum, Italy to attend the FLAEI Congress. The government did not charge O'Leary. It presented no evidence that he acted with criminal intent, knew of any criminal purpose, or did anything beyond taking an assigned trip and seeking reimbursement for ordinary travel expenses.

That defeats aiding-and-abetting liability. Section 2 requires proof that the defendant shared the intent to commit the underlying offense. *United States v. Willis*, 476 F.3d 1121, 1125 (10th Cir. 2007); *United States v. Rufai*, 732 F.3d 1175, 1190 (10th Cir. 2013). If the government's theory is that O'Leary's travel was the underlying embezzlement, the government had to prove a culpable principal or culpable offense for Mr. Creeden to aid and abet. It proved none.

The principal-liability theory fails too. Count 19 required proof that Mr. Creeden embezzled, stole, abstracted, or converted IBB money to his own use or the use of another. The government did not prove that Mr. Creeden traveled, received the money, obtained any benefit from the trip, or converted the funds through anything beyond administrative processing of assigned travel.

Calling assigned travel costs a "benefit" does not prove embezzlement. Airfare, lodging, meals, and incidentals were the mechanics of the assignment. They were not

48

evidence that O'Leary or Creeden converted union property with criminal intent. Assignment letters and reimbursement paperwork do not prove theft. At most, they prove ordinary union travel administration. Count 19 cannot stand.

### B.      Count 45 fails because Creeden was retired at the time.

Count 45 cannot stand against Mr. Creeden because the charged transaction occurred after he retired from the Boilermakers Union. Section 501(c) is not a general after-the-fact theory of labor-union responsibility. It criminalizes embezzlement, stealing, abstraction, or conversion by a person who is "employed by" the labor organization. The government therefore had to prove that Mr. Creeden was still employed by the Boilermakers Union when the Count 45 transaction occurred, or at least that he took some affirmative act while still employed that caused that transaction. It did neither.

The timing defeats the count. Mr. Creeden retired in 2023 after serving as International Secretary-Treasurer.[61] By the time of the charged Count 45 payout, Mr. Creeden was no longer the International Secretary-Treasurer. He no longer held union office. He no longer processed payments, reviewed payroll, approved vacation treatment, or exercised any employment-based authority over union funds. Retirement ended the office-based relationship that supplies the statutory hook for § 501(c). A later transaction cannot be attributed to him merely because he once held a union office.

---

[61] *See* 5 Trial Tr. 583 (Simmons testifying that Creeden served from approximately 2005 until retirement in 2023, about 18 years).

The government also failed to prove that Mr. Creeden caused the Count 45 payout before he retired. The record instead showed that McManamon's vacation payout was approved by someone else.[62] That matters because aiding-and-abetting doctrine requires an affirmative act that helps bring about the charged offense, coupled with intent that the offense succeed. The government cannot satisfy that requirement with status, past employment, or prior participation in ordinary union administration. For Count 45, it had to prove that Mr. Creeden did something—while still in a position to act—that intentionally assisted the specific vacation payout charged in that count. The trial record supplies no such proof.

The government's theory would convert retirement into continuing criminal responsibility for transactions that occurred after Mr. Creeden left office. Section 501(c) does not work that way. Count 45 required proof tied to the charged transaction, the charged timing, and Mr. Creeden's own conduct. Because the transaction occurred after his retirement and the government proved no affirmative act by him causing it, the evidence is insufficient as to Count 45.

---

[62] *See* 10 Trial Tr. 2069–70 (Stapp identifying Exhibit 298 and confirming approval by Dan McWhirter).

## VI.    The mixed verdict underscores the need for Rule 29 relief.

Rule 29 analysis proceeds independently of the verdict. That is the rule's purpose: legally insufficient counts should not depend on the jury at all.

Still, the verdict confirms the need for disciplined review. Mr. Creeden was acquitted on a substantial number of counts, including counts built on the same themes the government used to pursue the counts of conviction. Those acquittals do not supply the Rule 29 standard. But they show why the government cannot defend the remaining convictions by invoking the case in bulk.

Rule 29 requires count-by-count, element-by-element, defendant-specific review. The government tried an atmosphere case. It invited inferences from office, association, volume, and proximity to Newton Jones. The jury did not accept that theory wholesale. Each conviction must stand on its own proof. These convictions do not.

## VII.    The government's theory has no limiting principle.

### A.    The government erases elements that separate governance from crime.

The government's theory cannot be limited to this case. It works only by deleting the elements that separate internal governance from federal crime. For RICO, that element is enterprise distinctness. For § 501(c), it is authorization. For wire fraud, it is deception and a money-or-property object.

Those limits matter. They prevent federal criminal law from becoming a roving commission to supervise the internal affairs of unions, nonprofits, associations, and corporate boards. A reading that would attach criminal penalties to a "breathtaking amount

51

of commonplace" conduct is presumptively implausible. *Van Buren v. United States*, 593 U.S. 374, 391–93 (2021). And when the choice is between a bounded reading and a "near limitless" one, precedent and prudence require the bounded reading. *Dubin v. United States*, 599 U.S. 110, 118, 129–31 (2023).

**B.      The theory turns ordinary organizational execution into felony exposure.**

The government's theory criminalizes execution. An organization delegates authority to officers. A board or governing body approves a transaction. A finance officer implements it. Years later, prosecutors argue that the transaction should have been routed differently, documented better, approved by another internal body, or judged unwise in hindsight. From there, the implementing officer becomes a thief, the approved transaction becomes embezzlement, and the internal governance dispute becomes criminal intent.

That is not how these statutes work. RICO does not turn an organization's own officers into a separate association-in-fact enterprise whenever prosecutors challenge how those officers used organizational authority. *Board of County Commissioners of San Juan County v. Liberty Group*, 965 F.2d 879 (10th Cir. 1992), gives the limiting rule: officers and employees acting in the ordinary course do not become an association-in-fact enterprise separate from the organization itself. *Id.* at 886. Section 501(c) does not make every disputed approval, procedural defect, or fiduciary disagreement a federal felony. Authorized transactions are not embezzlement. *United States v. DeFries*, 129 F.3d 1293, 1306–07 (D.C. Cir. 1997). Wire fraud protects money and property from deception. It does not enforce prosecutors' preferred standards of governance, disclosure, or conflict

management. *Kelly v. United States*, 590 U.S. 391, 398–404 (2020); *Ciminelli v. United States*, 598 U.S. 306, 315–17 (2023).

### C.    The trial proof confirmed that the government has no workable line.

The trial proof confirmed the danger. When pressed to identify the practical line between lawful governance and federal crime—how to separate permissible from criminal dollars, locations, approvals, or on-the-ground decisions—the government's key witnesses could not articulate a coherent limiting principle. Newman admitted that the government used no objective scale for lodging or accommodations and that the line turned on a judgment call about reasonableness. Stojak's testimony showed the same problem.

That failure matters here and beyond this verdict. A rule that trained investigators cannot explain will not guide union officers, nonprofit directors, corporate fiduciaries, auditors, lawyers, or courts. It will only invite prosecutors to draw the line after the fact. Criminal liability cannot rest on a standard so elastic that it supplies no notice before indictment and no constraint after it.

### D.    Federal criminal law cannot leave that line to prosecutorial discretion.

The government cannot answer that prosecutors will exercise restraint. Courts do not construe criminal statutes on the assumption that the government will use them responsibly. *McDonnell v. United States*, 579 U.S. 550, 576 (2016); *Dubin v. United States*, 599 U.S. 110, 131 (2023). A theory that leaves the line between governance and felony to prosecutorial discretion supplies no limiting principle at all. *See Marinello v. United States*, 584 U.S. 1, 11 (2018).

The federalism problem confirms the point. Internal governance—compensation, travel, expenses, conflicts, officer authority, board approval, and recordkeeping—is ordinarily governed by state corporate law, fiduciary-duty law, union civil remedies, member remedies, shareholder remedies, and regulator-specific civil enforcement. Courts do not lightly read federal criminal statutes to "effect a significant change in the sensitive relation between federal and state criminal jurisdiction." *Bond v. United States*, 572 U.S. 844, 858 (2014). Nor do they assume Congress abandoned its traditional "reluctan[ce] to define as a federal crime conduct readily denounced as criminal by the States." *United States v. Bass*, 404 U.S. 336, 349 (1971).

Rule 29 prevents that expansion. The Court need not decide broad policy questions to enforce settled statutory limits. It need only hold the government to the elements Congress enacted. Organizational personnel acting through organizational channels are not a separate RICO enterprise. Authorized transactions are not embezzlement. Governance and disclosure theories are not property fraud. And proximity to a challenged institutional decision is not proof of criminal intent.

## Conclusion

William Creeden is innocent. The motion for a judgment of acquittal should be granted as to all counts.

Respectfully submitted,

Federico Andino Reynal
The Reynal Law Firm, PC
917 Franklin Street, Sixth Floor
Houston, TX 77002
Tel: 713-228-5900
areynal@frlaw.us

Kurt P. Kerns # 15028
Kerns Law Group
328 N. Main Street Wichita, KS 67202
Tel: 316-265-5511
kurtpkerns@aol.com

/s/ Chad Flores
Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, TX 77002
Tel: (713) 364-6640
chad@chadflores.law

Attorneys for William Creeden

**Certificate of Service**

A true and correct copy of the foregoing document was served via the Court's CM/ECF system to all registered counsel of record on the day of its filing.

 /s/ Kurt Kerns
Kurt Kerns