UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

NEWTON JONES (01),
WILLIAM CREEDEN (02),
KATERYNA JONES (03),
LAWRENCE MCMANAMON (05),

    *Defendants*.

Case No. 2:24-cr-20070-DDC

**Defendant William Creeden's
Reply in Support of his
Motion for a Judgment of Acquittal**

## Table of Contents

Reply ...........................................................................................................4

I.     Count 1 warrants a judgment of acquittal. ...............................................5

     A.     No distinct enterprise.................................................................. 6

     B.     The government did not prove an agreement. ........................... 10

     C.     The government did not prove one RICO conspiracy................................13

II.     Count 48 warrants a judgment of acquittal............................................ 16

     A.     The government did not prove an unauthorized appropriation...................17

     B.     The loan's structure and repayment negate the government's conversion and intent inferences. ............................................................... 21

     C.     The government did not prove criminal conversion. ................................ 23

     D.     The government did not prove fraudulent intent. .................................... 25

III.     Count 53 warrants a judgment of acquittal. ........................................... 27

     A.     The government proved no deception. ..................................................... 28

     B.     The government proved no decisional influence........................................ 30

     C.     The government proved no money-or-property object. ............................. 33

IV.     Counts 2 through 48 warrant a judgment of acquittal. .......................... 35

     A.     The government did not prove lack of authorization. ............................... 35

     B.     The same authorization defect defeats the remaining § 501(c) counts....... 38

V.     Other important counts warrant a judgment of acquittal. ..................... 41

     A.     Count 19 fails because the government proved neither principal liability nor aiding-and-abetting liability................................................ 41

     B.     Count 45 fails because the government did not prove Mr. Creeden caused or intentionally assisted the payout. ......................................... 43

VI.     The mixed verdict underscores the need for Rule 29 relief................................ 45

VII.    The government's theory has no limiting principle. ............................................ 46

    A.    The government erases elements that separate governance from crime. ... 47

    B.    The theory turns ordinary organizational execution into felony exposure.  47

    C.    The trial proof confirmed that the government has no workable line......... 49

    D.    Federal criminal law cannot leave that line to prosecutorial discretion. ...... 50

Conclusion ............................................................................................................... 51

**Reply**

The government's case repeatedly substitutes institutional activity for the criminal elements it had to prove. That problem is clearest on Count 1. The government charged a distinct "Jones Enterprise," not the International Brotherhood of Boilermakers (IBB), yet its proof showed IBB officials acting through IBB offices, authority, records, and systems. It showed communications, approvals, and overlapping institutional roles, but no agreement by Mr. Creeden to join a racketeering enterprise. And it showed separate Newton Jones-centered allegations, not one interdependent conspiracy. Workplace relationships and ordinary organizational coordination cannot supply the missing enterprise, agreement, or rim.

The same defect runs through the substantive counts. The government turns disputed governance into crime by collapsing distinct legal requirements into one broad accusation of impropriety. Under § 501(c), questions about approval, internal procedure, fiduciary responsibility, or conflict rules do not eliminate the need to prove unauthorized theft-like conversion and criminal intent. Under wire-fraud law, dissatisfaction with compensation or disclosure does not eliminate the need to prove a material deception directed at money or property. Rule 29 measures the evidence against those legal elements, not against a generalized theory that organizational decisions were bad, excessive, or improperly administered.

4

The government repeatedly relies on office, association, and inference where defendant-specific proof is required. Mr. Creeden's position as Secretary-Treasurer does not prove that he personally authorized every expenditure processed through that office. His presence in an institution does not prove agreement with every alleged scheme. And the government cannot stack one institutional inference on another until ordinary administration becomes criminal intent. The statutes already draw the relevant lines. Enforcing those lines is not policymaking; it is the Rule 29 inquiry. Where the government failed to prove the elements that separate governance from crime, acquittal is required.

## I.     Count 1 warrants a judgment of acquittal.

Count 1 fails at every necessary level. The government charged a conspiracy to violate RICO through the "Jones Enterprise," not the IBB. But the proof established neither a distinct Jones Enterprise, nor Mr. Creeden's agreement to join such an enterprise, nor one connected RICO conspiracy tying the government's separate Newton Jones-centered allegations together. Instead, the evidence showed IBB personnel performing institutional roles through IBB authority, systems, and channels. Doc. 485 at 9–25.

The response does not fill those gaps. On enterprise, it substitutes the IBB for the distinct Jones Enterprise the government charged and expressly elected to prove. On agreement, it treats communications and complementary institutional roles as assent to racketeering. And on interdependence, it treats common personnel, repeated transactions, and a common central actor as the missing rim. Those arguments describe organizational

5

coordination. They do not prove the distinct enterprise, criminal agreement, or single interdependent conspiracy Count 1 required.

### A.     No distinct enterprise.

The motion argued that the government elected to prove an actually existing "Jones Enterprise" distinct from the IBB and then failed to do so. The IBB was neither the charged enterprise nor the enterprise the government claimed to prove. *Board of County Commissioners of San Juan County v. Liberty Group,* 965 F.2d 879 (10th Cir. 1992), reinforced by *Brannon v. Boatmen's First National Bank of Oklahoma,* 153 F.3d 1144 (10th Cir. 1998), *George v. Urban Settlement Services,* 833 F.3d 1242 (10th Cir. 2016), and *Llacua v. Western Range Association,* 930 F.3d 1161 (10th Cir. 2019), establishes that officers and employees do not form a separate association-in-fact merely by performing organizational functions through organizational authority. The trial proof showed exactly that: IBB personnel using IBB titles, approval channels, accounting systems, records, and governance machinery to address ordinary institutional subjects. Doc. 485 at 9–19.

### 1.     The government applies the wrong distinctness test.

The government first counters that RICO distinctness requires separation between the defendant "person" and the enterprise—not separation between an organization and the officers through whom it acts—and thus was satisfied because Mr. Creeden and the other natural-person defendants were distinct from the alleged Jones Enterprise; it adds that Mr. Creeden's authorities concern materially different organization-as-defendant

configurations. *See* Doc. 504 at 2–4. That argument skips the enterprise the government charged and elected to prove.

The government did not charge the IBB as the enterprise. It repeatedly disclaimed that theory. It told the Court that "the Jones Enterprise is not the IBB itself," 18 Trial Tr. 4061, and told the jury that "[t]he Jones Enterprise is not the Boilermakers Union" because the union was instead its victim. 20 Trial Tr. 4232–33. Cases holding that an individual officer is distinct from a corporation that itself serves as the enterprise therefore answer a different question.

The government's trial election makes the mismatch sharper. When the Court asked whether the government was proceeding on the theory that the evidence established an actual enterprise, the government answered yes. 18 Trial Tr. 4008. Instruction No. 22 accordingly required the jury to find that the "Jones Enterprise, as charged in the Indictment, actually existed," and Instruction No. 23 supplied the enterprise requirements. 20 Trial Tr. 4146, 4149. The government cannot seek a verdict on that theory and defend it by substituting the IBB as the enterprise after trial.

The Court's pretrial ruling does not resolve the post-trial question. It held before trial that an existing enterprise ordinarily is not a separate § 1962(d) requirement, but expressly left for trial whether the government could prove the Jones Enterprise sufficiently distinct from the IBB. Doc. 225 at 6–10. The present motion asks that evidentiary question on a completed record.

And even apart from the government's election, its cases do not establish the distinctness it needs. They show that Mr. Creeden could be distinct from the IBB if the IBB were the enterprise. They do not show that selected IBB personnel acting through IBB roles and machinery constituted the separate Jones Enterprise charged here.

### 2.    Selected IBB officers did not become a separate enterprise.

The government next counters that the Jones Enterprise consisted only of a particular group of officials who allegedly took control of the IBB for personal enrichment rather than the union or its workforce generally, and that their alleged crimes fell outside legitimate job duties and bypassed union safeguards. *See* Doc. 504 at 4–5. Calling selected organizational personnel a corrupt subgroup does not establish a separate enterprise.

*Board of County Commissioners of San Juan County v. Liberty Group,* 965 F.2d 879 (10th Cir. 1992) supplies the relevant rule: officers and employees "in the ordinary course of their duties" cannot constitute an association-in-fact separate from their organization. *Id.* at 886. *Llacua v. Western Range Association,* 930 F.3d 1161 (10th Cir. 2019) reinforces the same principle: an organization does not create a distinct enterprise merely by associating with its own members to carry out organizational functions. *Id.* at 1182–85. The government invokes the individual-versus-organization rule while ignoring the organizational-attribution rule that addresses this case.

Alleged illegality does not solve the problem. Distinctness asks whose conduct the evidence showed; illegality asks whether that conduct violated the law. An officer does not

stop acting through organizational authority merely because prosecutors later call the exercise of that authority criminal.

The proof remained institutional from beginning to end. Authority came from IBB offices, the Constitution, and long-established International Executive Council (IEC) policies. Expenses moved through IBB approval and accounting systems. Travel moved through assignment letters and travel packets. Compensation, personnel, legal work, and investment decisions moved through IBB officers, the IEC, counsel, and formal records. The government found no separate financial machinery, separate books, secret accounts, or independent command structure belonging to a Jones Enterprise.

That record may support an allegation that IBB authority was abused by one of the other defendants. It does not prove a separate association-in-fact.

### 3.    The Bank and RICO's purpose do not prove distinctness.

The government finally counters that the alleged racketeering extended beyond the IBB to the Bank of Labor and that Mr. Creeden's theory would improperly immunize corrupt union officers who use union machinery to commit racketeering, contrary to RICO's purpose and cases sustaining RICO convictions of union officials. *See* Doc. 504 at 5–7. Neither point proves the Jones Enterprise.

Bank involvement shows that some alleged conduct concerned another institution. It does not establish a separate continuing association with its own structure or objective. The Bank matters still moved through formal IBB and Bank channels, including IEC action

9

and Bank-board action. Another institutional participant does not create the missing enterprise.

Nor does Mr. Creeden claim immunity for union officers. Union officers can violate RICO when the government proves RICO's elements. The danger runs the other way. If ordinary organizational execution can supply the missing enterprise or agreement whenever prosecutors later characterize an internal governance decision as improper, RICO ceases to distinguish racketeering from administration. That logic would not stop with unions. It would reach officers and directors throughout organizational life whenever they implement decisions later attacked as violating bylaws, board policy, internal procedure, or fiduciary obligations.

The government's authorities simply involve a different structure in which an organization itself served as the enterprise. This prosecution chose another path. The government insisted the IBB was not the enterprise. RICO's general purpose cannot relieve it of proving the separate Jones Enterprise it charged.

### B.    The government did not prove an agreement.

The motion next argued that Count 1 fails because conspiracy requires an actual agreement, not office, association, or parallel conduct. *Iannelli v. United States,* 420 U.S. 770 (1975), and *Salinas v. United States,* 522 U.S. 52 (1997), make agreement the essence of conspiracy, and Tenth Circuit law likewise requires proof that Mr. Creeden knowingly joined the charged unlawful endeavor. Yet the record showed role performance.

10

A president authorizes. Auditing scrutinizes. Finance processes. Human resources administers. Accounting records. Those complementary institutional functions show coordination, not assent to racketeering. Even the government's witnesses supplied no agreement by Mr. Creeden to join a criminal enterprise. Doc. 485 at 19–23.

### 1.    Circumstantial proof still must establish the charged agreement.

The government first counters that RICO conspiracy requires neither an express agreement nor secrecy, coded communications, or other formal badges of conspiracy, and that a tacit agreement may instead be inferred from contacts, transactions, and the surrounding circumstances. *See* Doc. 504 at 7–8. Mr. Creeden does not dispute that rule. Circumstantial evidence still must prove that he knowingly joined the charged RICO objective.

The government instead relies on circumstances with an obvious institutional explanation. Senior officers communicated because they ran the same union; finance personnel processed expenditures because that was their job; employees used common travel and accounting systems because the IBB required it. Those facts prove coordination, not agreement to conduct a Jones Enterprise through racketeering.

Rule 29 permits reasonable inferences, but it does not permit association to replace agreement. The government still needed evidence connecting ordinary organizational coordination to the charged criminal objective.

### 2.    The cooperators did not identify a RICO agreement.

The government next counters that Fairley, Brown, and Stapp supplied testimony supporting an agreement, including Fairley's testimony about an unwritten agreement by acquiescence, Brown's testimony concerning an agreement surrounding Kate Jones's employment and backpay, and Stapp's testimony about her role in allegedly unlawful transactions. See Doc. 504 at 8. Even fully credited, that testimony does not establish Mr. Creeden's agreement to conduct the Jones Enterprise through a pattern of racketeering.

Agreement about a particular transaction is not agreement to join a RICO enterprise. Kate Jones's backpay illustrates the distinction. Stapp described a documented chain: Newton Jones directed Brown; HR calculated the amount; the matter returned to Brown for approval from the President's Office; and Mr. Creeden then signed off for the Secretary-Treasurer's office. Stapp testified that the documentation was required and that this sort of payment correspondence was part of her normal duties. 9 Trial Tr. 1763–64. That is institutional routing, not proof that Mr. Creeden assented to a RICO objective. A witness's later characterization of the transaction as improper does not establish a contemporaneous meeting of the minds on the broader criminal objective.

The surrounding testimony underscores the gap. Fairley acknowledged there was no conversation in which the group expressly agreed to commit a crime and characterized the alleged agreement instead as one inferred "by our actions." 6 Trial Tr. 947–48, 1028. Brown testified that there was "no agreement to become a racketeer," no communication memorializing one, and no agreement among the group to commit criminal acts. 8 Trial Tr.

1450–51, 1456. The proof describes discrete decisions and institutional interactions, not the RICO agreement Count 1 required.

### 3.    Role performance is not assent to racketeering.

The government finally counters that the defendants manifested assent through participation in complementary roles—including directing, approving, processing, and implementing allegedly unauthorized expenditures—without which the alleged conspiracy could not have operated. See Doc. 504 at 8–9. That reasoning converts ordinary organizational interdependence into criminal agreement.

A president authorizes. Auditing scrutinizes. Finance processes. Human resources administers. Accounting records. Those complementary functions do not show a shared criminal objective merely because prosecutors later attack the underlying transactions.

The government found no separate payment system, hidden command structure, coded communications, or agreement by Mr. Creeden that IBB machinery would serve a criminal enterprise. Coordination is not the element. Agreement is.

### C.    The government did not prove one RICO conspiracy.

The motion further argued that the government proved separate spokes around Newton Jones, not the single connected conspiracy Count 1 charged. *Kotteakos v. United States,* 328 U.S. 750 (1946), and *United States v. Evans,* 970 F.2d 663 (10th Cir. 1992), require more than several people dealing with a common central actor; the spokes must connect through a shared criminal objective and interdependence. Here, the family-benefit, vacation, surveillance, and Bank allegations involved different participants, mechanics,

records, and supposed objectives. The Bank evidence involving Mr. Creeden did not supply the missing rim. Doc. 485 at 23–25.

### 1.    Instruction No. 27 did not eliminate interdependence.

The government first counters that Instruction No. 27 did not require each conspirator to know every coconspirator or every activity undertaken by the conspiracy. See Doc. 504 at 9. True, but that rule presupposes one conspiracy. The government still had to prove interdependence.

That requirement comes from substantive conspiracy law, not from whether the charge separately listed the word. *United States v. Simpkins,* 90 F.4th 1312 (10th Cir. 2024) requires sufficiency to be measured against the legal elements, not merely the elements recited in the instruction. *Id.* at 1314. The companion Rule 29 ruling in this prosecution likewise treated interdependence as a requisite conspiracy element and held its absence independently fatal to Count 1. *United States v. McManamon,* No. 24-20070-05-DDC, 2026 WL 2029695 (D. Kan. July 14, 2026).

*Kotteakos v. United States,* 328 U.S. 750 (1946), and *United States v. Evans,* 970 F.2d 663 (10th Cir. 1992), supply the governing rule: common contact with a hub does not establish one conspiracy without meaningful interconnection among the spokes. A conspirator need not know every participant or detail, but the government must first prove one interdependent conspiracy for him to join.

### 2.    Relationships and communications do not supply the rim.

The government next counters that the alleged conspirators had known one another for years, worked for the same organization, and communicated with one another hundreds or thousands of times during the charged period about allegedly unlawful activities. *See* Doc. 504 at 9. Those facts show opportunity and a shared workplace, not interdependence.

The government's inference is especially weak because the connective conduct it invokes—communications, approvals, and financial processing—is generally lawful institutional activity. *United States v. Baldridge,* 559 F.3d 1126 (10th Cir. 2009) explains that when the underlying transaction is generally lawful, an illegal common purpose cannot be inferred as it can from inherently illegal conduct; interdependence "must be proved more precisely," including proof that each defendant's actions benefited the common venture. *Id.* at 1137. The government supplied no such proof here. It showed common institutional machinery surrounding separate allegations. It did not show that the family, travel, vacation, surveillance, and Bank spokes benefited or depended on one another.

Frequent communication among senior officials running a national labor organization is expected. The government needed to show that the alleged schemes depended on or advanced one another. It did not.

Family benefits did not depend on Bank lending. Vacation payouts did not advance surveillance. Bank compensation did not depend on relocation or restaurant expenses. Common employment and frequent communication do not supply the missing rim.

### 3.   Multiple transactions do not establish one conspiracy.

The government finally counters that Mr. Creeden received Jones's directives through Brown, directed Stapp to make allegedly unauthorized payments, and approved backpay, restaurant, relocation, travel, and vacation expenditures involving several alleged conspirators, permitting the jury to find one connected conspiracy rather than separate Jones-centered spokes. *See* Doc. 504 at 9. Repeated participation by one person does not merge separate schemes into one conspiracy.

The government's list shows, at most, that the Secretary-Treasurer's office touched multiple IBB transactions. It does not show that the alleged schemes depended on one another or shared a single criminal objective.

Even assuming Mr. Creeden knowingly joined some Bank-related wrongdoing, that would not establish one conspiracy encompassing every other Jones-centered allegation. Count 1 charged one conspiracy. The proof never supplied the rim.

## II.   Count 48 warrants a judgment of acquittal.

The motion argued that Count 48 fails because the government did not prove an unauthorized criminal appropriation, a theft-like conversion, or fraudulent intent. The evidence instead showed an institutionally approved $7 million Bank loan, an enforceable repayment obligation, repayment with interest, no personal diversion to Mr. Creeden, and an open transaction from which he abstained when the Bank board voted. Doc. 485 at 25–37.

The government answers principally by calling the later loan unauthorized and treating that premise as enough to prove the rest. It is not. Later documentation does not prove the IEC's lending authority had expired; Bank-side approval and Mr. Creeden's abstention remain powerful evidence of the transaction's character and his intent; the loan obligation and repayment with interest bear directly on conversion and intent; and Mr. Creeden's separate Bank compensation does not connect the $7 million to him. The government can dispute internal approval. It still must prove embezzlement.

## A.   The government did not prove an unauthorized appropriation.

The motion first argued that lack of authorization is an element of § 501(c), not a collateral governance question. *United States v. DeFries,* 129 F.3d 1293 (D.C. Cir. 1997) explains that authorized property cannot be embezzled. *Id.* at 1306–07. Here, the IEC had formally authorized lending to the Bank up to $20 million. Ex. 1084; *see* 4 Trial Tr. 499–500. The charged $7 million fell within that amount, and Mr. Creeden was not an IEC member and had no IEC vote. 4 Trial Tr. 476–77, 480. The government's attempt to distinguish a "loan" from a "line of credit" could not carry its burden because its own Bank witness described the concepts as overlapping and sometimes interchangeable, while the Bank board separately approved the transaction with Mr. Creeden abstaining. Doc. 485 at 26–29.

17

### 1.    The government's chronology does not establish lack of authorization.

The government first counters that a twelve-year-old line of credit could not reasonably be treated as blanket authorization for the later MORE Fund loans because the MORE Fund did not exist until 2018, the parties executed new loan agreements containing separate repayment terms and interest provisions, and the earlier credit facility may not even have remained active. *See* Doc. 504 at 9–10. Those facts establish chronology. They do not establish that the IEC's lending authority expired.

The operative question is whether the government proved that the authority to extend up to $20 million in credit to the Bank had been rescinded, exhausted, expired, or excluded the later extension. The response identifies later dates, a later funding source, and later documentation. It identifies no legal or institutional act terminating the earlier authority.

The government's own witness also undermined a categorical distinction between the instruments. McCall testified that a line of credit is a type of loan, that both arrangements are loans, and that financial institutions sometimes use the terms interchangeably. 13 Trial Tr. 3003–06. Later loan papers therefore show documentation of later credit; they do not themselves prove that the credit fell outside the IEC authorization.

The MORE Fund's later creation is relevant. It is not dispositive. The government bore the burden to prove unauthorized appropriation, and chronology alone does not satisfy it. Nor can the response treat age as dispositive when the prior IEC authorization favors

18

Mr. Creeden while treating historical union restrictions as continuing to bind him. The government needs a principled reason why one remained operative and the other did not. It offers none. Those positions rise and fall together.

### 2.     Bank approval matters to transaction character and intent, not union authorization.

The government next counters that only the IBB's authorization mattered under § 501(c), making the Bank board's approval of the loans and Mr. Creeden's abstention from the Bank-side vote irrelevant to whether the union authorized the use of its money. *See* Doc. 504 at 10. That answers an argument the motion does not make.

Mr. Creeden does not claim that the Bank supplied union-side authority. The IEC supplied the asserted IBB authority. The Bank evidence matters because it shows how the transaction operated: the borrower formally considered the loan, independent directors approved it, and Mr. Creeden abstained. 13 Trial Tr. 2990–91.

Those facts cut directly against the government's broader picture of a covert, self-interested taking. Two institutions documented and processed the transaction through formal channels. Bank approval does not replace IBB authorization; it corroborates that the transaction was treated as an institutional loan rather than a hidden diversion.

The same evidence bears on intent. Mr. Creeden did not use his Bank vote to force the transaction through. The government cannot call his abstention irrelevant while relying on the same dual-role relationship to prove criminal motive.

### 3. Conflict and bypass theories do not prove unauthorized appropriation.

The government finally counters that Jones and Mr. Creeden deliberately bypassed the IBB Board of Trustees and IEC in executing the loans and that Mr. Creeden violated the IBB conflict-of-interest policy governing union decisions concerning the Bank. *See* Doc. 504 at 10. Neither proposition establishes unauthorized appropriation under § 501(c).

The bypass label also skips the Board's composition. Simmons testified that the Board consisted of the International President, the Secretary-Treasurer, and one international vice president and acted by a two-thirds vote; another witness confirmed that Newton Jones and Mr. Creeden were two of its members. 4 Trial Tr. 393–94; 7 Trial Tr. 1346. The government may dispute whether those two members completed whatever formal Board process was required. But it cannot simply say they "bypassed" a Board whose voting majority they comprised without identifying the additional act the Constitution required and proving that it was missing. The response identifies no constitutional provision or later IEC action establishing that each later extension required a new vote notwithstanding that authority.

The conflict-policy theory is further removed. Conflict rules govern decisionmaking behavior. Section 501(c) criminalizes embezzlement, stealing, unlawful abstraction, and willful conversion. *United States v. DeFries,* 129 F.3d 1293 (D.C. Cir. 1997) rejects the collapse of fiduciary impropriety into automatic criminal unauthorized appropriation. *Id.* at 1306–07.

20

Mr. Creeden's Bank-side abstention also matters here. It does not resolve union authority, but it forecloses treating the mere existence of a conflict as self-proving evidence of theft.

### B. The loan's structure and repayment negate the government's conversion and intent inferences.

The motion next relied on the loan's structure, repayment obligation, and ultimate repayment as evidence that the transaction was a loan rather than a theft. That evidence matters not because repayment is a freestanding defense or because § 501(c) contains a separate deprivation-of-value element, but because it bears on whether the government proved wrongful conversion and fraudulent intent. The union exchanged cash for an enforceable repayment obligation, and the Bank ultimately repaid the principal with interest that the union recorded as income. The government proved no unrecovered principal, write-off, hidden diversion, or uncompensated taking. Doc. 485 at 29–32.

#### 1. Temporary unavailability does not turn a loan into criminal conversion.

The government first counters that the $7 million was converted to the Bank's use during the loan term and thereby became unavailable for the MORE Fund's designated recruitment purpose. *See* Doc. 504 at 10–11. Temporary unavailability is an ordinary characteristic of lending. It does not itself establish a wrongful conversion.

The union exchanged cash for a repayment obligation bearing interest. McCall described the transaction as a loan with repayment terms, and Gaia confirmed repayment with interest. 13 Trial Tr. 3003–06, 3076–77; 16 Trial Tr. 3745–46. Stojak confirmed that the interest appeared as union income. 11 Trial Tr. 2326.

The recruitment restriction may bear on authorization. It does not establish that temporary unavailability itself was a criminal conversion. Otherwise, every loan would become a conversion during its term.

Section 501(c) requires proof of embezzlement or another criminal conversion, not merely that cash left one account pursuant to a loan.

### 2.    Repayment bears on transaction character and intent.

The government next counters that eventual repayment with interest was beside the point because nothing in § 501(c) excuses an expenditure that the union never properly authorized in the first place. *See* Doc. 504 at 11. Mr. Creeden does not argue that repayment retroactively authorizes a completed theft.

Repayment matters because it shows what transaction occurred. The parties documented a loan, created a repayment obligation, charged interest, recorded the transaction, and performed those terms. That evidence bears directly on value, conversion, and intent.

The government instead collapses every element into authorization: once it declares the initial expenditure unauthorized, it treats the loan structure, repayment, conversion, and intent as irrelevant. Section 501(c) does not permit that shortcut.

22

Repayment cannot erase a theft once proved. But the government cannot erase repayment when asking whether the evidence proved a theft in the first place.

### C.    The government did not prove criminal conversion.

The motion also argued that the government proved no theft-like conversion of the charged funds to Mr. Creeden. Section 501(c) requires conversion to a prohibited use, yet no evidence showed that Mr. Creeden received the $7 million, controlled it personally, routed it through a personal entity, or obtained a fee, commission, kickback, distribution, or other benefit from the loan proceeds. The money went to the Bank structure and returned to the union with interest. Doc. 485 at 32–34.

#### 1.    The Bank's use of loan proceeds does not itself establish criminal conversion.

The government first counters that personal benefit is not required because § 501(c) expressly reaches conversion to "the use of another," that the Bank used the $7 million while the loans remained outstanding, and that Instruction No. 28 conveyed that statutory theory. See Doc. 504 at 11–12. The phrase "use of another" does not eliminate the requirement of unlawful conversion.

Money received by a borrower under a loan necessarily becomes available for the borrower's use. That fact cannot itself establish criminal conversion. Otherwise, any institutional loan later disputed on internal-authority grounds would satisfy the conduct element automatically.

The government therefore still had to prove why the Bank's use of borrowed money constituted a wrongful diversion rather than the agreed consequence of a loan. The proceeds entered the Bank under a repayment obligation and returned with interest. 16 Trial Tr. 3745–46.

Identifying the Bank as "another" does not answer the missing question. The government still must prove a criminal conversion.

### 2. Bank compensation does not connect the $7 million to Mr. Creeden.

The government next counters that Mr. Creeden had a personal interest in the Bank receiving the money because the Bank was providing him a lucrative executive compensation package while allegedly requiring little or no work. *See* Doc. 504 at 12. That theory does not connect the charged property to him.

The government proved no payment of the MORE Fund proceeds to Mr. Creeden, no fee or commission tied to the loan, no bonus triggered by it, and no transfer of loan proceeds through a personal entity. His Bank compensation arose from a separate compensation arrangement.

At most, the government offers motive: Mr. Creeden had reason to care about the Bank's financial health. Motive is not conversion. To reach the statutory element, the government must stack assumptions from the loan to Bank strength, from Bank strength to continued compensation, and from continued compensation to conversion of the $7 million for Mr. Creeden's use.

24

That chain cannot substitute for proof of the charged conversion.

**D.      The government did not prove fraudulent intent.**

Finally, the motion argued that Count 48 lacks the criminal intent required by § 501(c). *United States v. Long,* 952 F.2d 1520 (8th Cir. 1991), and *United States v. Durnin,* 632 F.2d 1297 (5th Cir. 1980), distinguish criminal embezzlement from negligence or disputed fiduciary conduct. The record showed no concealment, personal extraction, or purpose to deprive the union. Mr. Creeden abstained from the Bank board vote, the transaction moved through formal institutional records and review, and the union received its principal back with interest. Doc. 485 at 34–37.

**1.      Governance defects do not prove fraudulent intent.**

The government first counters that Mr. Creeden deliberately participated in loans that bypassed the IBB Board of Trustees and IEC and violated the union's conflict-of-interest policy notwithstanding his abstention from the Bank-side vote. *See* Doc. 504 at 10. An alleged governance defect does not itself prove fraudulent intent.

Section 501(c) is not a strict-liability mechanism for enforcing internal union procedure. *United States v. Durnin,* 632 F.2d 1297 (5th Cir. 1980) distinguishes criminal intent from negligent, accidental, or innocent fiduciary conduct. *Id.* at 1299 & n.6. The government therefore cannot move from "another approval should have occurred" directly to "Mr. Creeden intended to steal."

25

The transaction's surrounding facts cut the other way. It was formally documented, considered by the Bank board, recorded by the institutions, and repaid with interest. Mr. Creeden abstained from the Bank vote. Those facts do not resemble a concealed taking.

A policy violation may support internal or civil consequences. It becomes § 501(c) only when the government proves the unlawful conversion and criminal intent the statute independently requires.

### 2.    Motive is not intent.

The government next counters that Mr. Creeden's Bank compensation gave him a personal interest in whether the Bank received the $7 million and permitted the jury to reject the premise that he lacked a personal stake in the transaction. *See* Doc. 504 at 12. A possible motive does not prove an intent to embezzle union property.

An officer may want an institution to succeed for many reasons without intending to steal from another institution that lends it money. Here, the institutional reason was concrete. The IBB owned roughly 58–59% of Bankshares, and McCall testified that the challenged borrowing supported the Bank's capital needs and capital-to-asset ratio. 13 Trial Tr. 2932, 3076–77. Supporting the Bank therefore implicated a substantial IBB financial stake, not merely Mr. Creeden's separate compensation. The government still needed evidence that Mr. Creeden intended an unlawful conversion.

The surrounding conduct matters. His Bank role was open. The Bank knew his IBB role. He abstained from the Bank loan vote. The government cannot turn a disclosed institutional relationship into criminal intent merely by assigning it a suspicious motive.

### 3.    Repayment is relevant to intent.

The government finally counters that repayment with interest did not undo the alleged offense because the relevant wrong occurred when union funds were committed without proper authorization. *See* Doc. 504 at 11. Repayment cannot erase a proved theft, but it strongly informs whether a theft was intended.

From inception through completion, the transaction operated as a loan. It generated formal loan documents, repayment obligations, interest, accounting entries, and actual repayment. The government found no side arrangement showing repayment was a sham and no hidden extraction of the principal by Mr. Creeden.

A planned loan and a planned theft are different transactions even though both begin with money leaving an account. This record followed the loan model through completion.

The government cannot treat that evidence as irrelevant to fraudulent intent.

## III.    Count 53 warrants a judgment of acquittal.

The motion argued that Count 53 fails because the government proved none of the features that make an arrangement wire fraud. The Bank knew Mr. Creeden's IBB role, appointed him to his Bank position, established his compensation, reviewed his performance, provided annual performance bonuses, and continued the arrangement. That evidence did not establish a deceptive scheme, a material deception capable of influencing the relevant decisionmaker, or a scheme directed at obtaining Bank money or property through deception. Doc. 485 at 37–44.

27

The response still identifies no deceptive act by Mr. Creeden. It labels his compensated position a false representation, but points to no false timesheet, hours certification, or statement that induced the Bank to pay him. It then tries to escape the Bank decisionmakers' knowledge by invoking shareholders, depositors, and customers who did not make the compensation decision. And its remaining LM-30 and conflict-policy theories concern disclosure and governance, not a scheme to obtain Bank property. The government has a theory of impropriety. It still lacks the fraud Count 53 required.

### A.    The government proved no deception.

The motion first argued that wire fraud requires an identifiable deceptive act, not merely an arrangement prosecutors later characterize as improper. *Kousisis v. United States,* 605 U.S. 114 (2025) confirms deception as a distinct requirement. *Id.* at 121–25. *United States v. Drake,* 932 F.2d 861 (10th Cir. 1991) requires a scheme calculated to deceive. *Id.* at 864. Yet the government identified no false timesheet, hours certification, full-time representation, or other false statement by Mr. Creeden that induced the Bank to compensate him. Payroll merely implemented a compensation arrangement the Bank itself had already approved, with full knowledge of Mr. Creeden's IBB position. Doc. 485 at 37–40.

### 1.    The government still identifies no deceptive act by Mr. Creeden.

The government first counters that Count 53 did not depend on concealing Mr. Creeden's employment or salary but instead charged that he falsely represented himself as

a full-time Bank executive while performing little or no productive work. *See* Doc. 504 at 12–13. Restating the indictment does not identify the deceptive act proved at trial.

The response identifies no statement by Mr. Creeden that he worked a specified number of Bank hours, no timesheet he submitted, no certification of full-time hours, and no representation that he lacked an IBB role. Instead, the government repeats the allegation that he "falsely represent[ed]" full-time work and treats the allegation as evidence of the representation itself.

The payroll evidence does not fill the gap. McCall testified that Bank officers did not log hours and addressed the "80-hour" notation as a payroll convention rather than an hours certification. 13 Trial Tr. 3117–18. He also rejected the characterization of the payroll records as fraudulent.

A jury could conclude that Mr. Creeden was overpaid or that the Bank did not need his position. Neither conclusion identifies a deceptive act through which he obtained Bank property. Wire fraud requires that missing link.

### 2.    No-work testimony does not supply the missing deception.

The government next counters that McCall testified Mr. Creeden performed no additional work as Senior Executive Vice President beyond his board role, that the position had not existed before Newton Jones suggested his appointment (by the Board) and was discontinued after he left, and that Elder similarly described the position as unnecessary. See Doc. 504 at 13. Those opinions concern the arrangement's value, not deception.

The Bank board approved Mr. Creeden's position. The Bank's compensation machinery approved his compensation. Independent directors later reviewed performance and awarded bonuses. *See* 13 Trial Tr. 2977–78, 3113; 14 Trial Tr. 3149–51. The government identifies no false representation that induced those decisions.

McCall's and Elder's view that the Bank did not need the position may support criticism of Bank judgment. It does not establish that the Bank reached that judgment because Mr. Creeden deceived it.

The causal sequence is missing. The Bank decided to pay Mr. Creeden and then paid him. The government did not prove that he first deceived the Bank and thereby caused the payment.

### B.    The government proved no decisional influence.

The motion next argued that the government failed to prove materiality because the supposed concealed facts were already known to the relevant decisionmaker. *Neder v. United States,* 527 U.S. 1 (1999), and *United States v. Gaudin,* 515 U.S. 506 (1995), make materiality turn on whether the representation could influence the decision at issue. The Bank knew Mr. Creeden's IBB role, approved his Bank appointment, set his compensation, reviewed his performance and compensation structure, and left the arrangement intact after scrutiny. A known fact cannot influence a decisionmaker through deception. Doc. 485 at 40–41.

30

### 1.    The Bank acted through informed decisionmakers.

The government first counters that approval by the Bank's leadership or board did not defeat materiality because the board was not synonymous with the Bank itself, and that IBB officials knew Jones and Mr. Creeden held Bank positions but did not know the details of those positions, the magnitude of their compensation, or the government's assertion that they performed almost no work. *See* Doc. 504 at 13. That abstraction avoids the property decision at issue.

A corporation acts through people. Here, the relevant decision was whether the Bank would appoint and compensate Mr. Creeden. The record identifies the board and compensation process as the mechanisms through which the Bank made those decisions. 13 Trial Tr. 2977–78, 3113. Those decisionmakers knew Mr. Creeden's dual role and approved the arrangement. The compensation itself was public as well. Welsh testified that Form 990 was publicly available and separately disclosed the compensation from the IBB and related Bank organization. 15 Trial Tr. 3515–16. That disclosure further undercuts the response's premise that the arrangement or its magnitude was hidden.

The arrangement was known and authorized on the union side as well. The IEC resolution authorized the President's Bank role and authorized the appointment of Mr. Creeden as executive vice president, subject to Bank-board acceptance. 6 Trial Tr. 878; 12 Trial Tr. 2823. The Bank board then approved the appointment. 13 Trial Tr. 3113; 14 Trial Tr. 3184–85.

31

The government cannot manufacture an uninformed victim by separating an abstract "Bank" from the human decisionmakers through whom the Bank acted.

### 2.     Other stakeholders cannot substitute for the property decisionmakers.

The government next counters that the Bank's other shareholders, depositors, and customers could have been unaware that it was paying more than $1 million annually to purportedly full-time executives who allegedly were not working. *See* Doc. 504 at 13. Those constituencies did not make the compensation decision.

The government identifies no shareholder, depositor, or customer whose approval was required before the Bank could pay Mr. Creeden. It identifies no false statement he made to them and no property decision they made because of one.

The substitution therefore exposes the problem. The people who made the payment decision knew the arrangement. The people the government speculates may not have known did not make that decision.

Wire fraud requires a scheme aimed at obtaining the victim's money or property through material deception. General stakeholder interests cannot supply it.

### 3.     Compensation size cannot supply materiality.

The government finally counters that receiving nearly half a million dollars per year based on the alleged charade of full-time work was itself a material falsehood. *See* Doc. 504 at 14. The amount of compensation cannot substitute for an identifiable falsehood capable of influencing the relevant decisionmaker.

A large number may make an accusation sound consequential. It does not identify what Mr. Creeden falsely represented, to whom he said it, or how it affected a decision. Those are separate elements.

The record instead showed a salaried arrangement knowingly created and repeatedly reviewed by the Bank. Bank officers did not submit hourly time records. 13 Trial Tr. 3117–18. Materiality follows deception. It cannot create the deception the government failed to prove.

### C.    The government proved no money-or-property object.

The motion independently argued that wire fraud protects money and property, not generalized interests in disclosure, conflict management, or good governance. *Kelly v. United States,* 590 U.S. 391 (2020), and *Ciminelli v. United States,* 598 U.S. 306 (2023), enforce that property boundary, while *Skilling v. United States,* 561 U.S. 358 (2010) forecloses converting undisclosed-conflict theories into ordinary property fraud absent the required honest-services theory. The government's LM-30 and Conflict Policy theories concerned regulatory disclosure and union governance, not Bank property, while the Bank itself independently decided to pay Mr. Creeden's compensation. Doc. 485 at 41–44.

The government counters that the salary theory itself supplied the required property object because Mr. Creeden allegedly obtained nearly half a million dollars per year from the Bank based on the false premise that he was working full time, which the jury could regard as a material falsehood resulting directly in the acquisition of Bank property. *See*

Doc. 504 at 14. Bank salary is property, but the government still had to prove that Mr. Creeden obtained it through a materially deceptive scheme.

That burden comes from law, regardless of how broadly the instructions described a "scheme to defraud." *United States v. Simpkins,* 90 F.4th 1312 (10th Cir. 2024) requires sufficiency to be measured against the legal elements. *Id.* at 1314. Thus, the general instruction's reference to honest services could not expand Count 53 beyond the property-fraud requirements imposed by *Kelly v. United States,* 590 U.S. 391 (2020), *Ciminelli v. United States,* 598 U.S. 306 (2023), and *Kousisis v. United States,* 605 U.S. 114 (2025): Bank property had to be an object of a materially deceptive scheme.

The salary theory therefore depends on Parts III.A and III.B. The Bank knowingly created the position, fixed the compensation, reviewed performance, and continued paying Mr. Creeden. The government proved no false hours certification, deceptive payroll submission, or other material misrepresentation that induced those decisions.

The response also leaves three special-verdict theories unanswered. Instruction No. 38 separately identified the LM-30 omission and two Conflict Policy theories, and the jury selected those theories along with the salary theory. 20 Trial Tr. 4171–74. Those theories concern regulatory reporting and union governance, not Bank property.

*Kelly v. United States,* 590 U.S. 391 (2020), and *Ciminelli v. United States,* 598 U.S. 306 (2023), do not permit regulatory or governance interests to substitute for property. *Skilling v. United States,* 561 U.S. 358 (2010) likewise confines honest-services fraud to bribes and kickbacks. *Id.* at 408–11. Count 53 charged neither.

34

The one theory the government now defends fails for lack of deception and materiality. The remaining theories lack a lawful property object. No valid theory remains.

## IV.    Counts 2 through 48 warrant a judgment of acquittal.

The motion argued that the same authorization failure extends beyond Count 48 to the remaining § 501(c) convictions. Section 501(c) criminalizes theft-like conduct; it does not make a finance officer a felon merely for processing transactions authorized through the union's President, IEC, or ordinary institutional channels. The record showed an organizational system in which substantive approval authority rested elsewhere and Mr. Creeden's Secretary-Treasurer role principally implemented and recorded those decisions. Doc. 485 at 44–48.

The government's response collapses two different propositions. Its evidence that the Secretary-Treasurer exercised financial review, countersignature, and payment responsibilities does not make Mr. Creeden the source of the underlying substantive authorization. And its reliance on federal fiduciary duties does not convert every alleged failure of internal oversight into embezzlement. However significant those responsibilities were, § 501(c) still required transaction-specific proof of unauthorized theft-like conversion and criminal intent. Office and fiduciary duty cannot substitute for either.

### A.    The government did not prove lack of authorization.

The motion argued that *United States v. DeFries,* 129 F.3d 1293 (D.C. Cir. 1997) makes unauthorized appropriation a distinct § 501(c) element. *Id.* at 1306–07. It further argued that the IBB Constitution placed substantive approval authority with the

International President and IEC. Article 9 of the Constitution assigned Mr. Creeden finance-office functions—custody, accounting, reporting, submission, payment, and recordkeeping—and expressly placed the Secretary-Treasurer under the President's supervision. Thus, even if the government believed Jones exercised his approval authority improperly, that did not prove that Mr. Creeden himself made an unauthorized appropriation by implementing the resulting transaction. Doc. 485 at 45–47.

### 1.  Article 9 did not make Mr. Creeden the ultimate spending authority.

The government first counters that the IBB Constitution did not obligate the Secretary-Treasurer to approve whatever the President directed because Article 9.1 placed union property in the Secretary-Treasurer's custody, required warrants to be "properly countersigned," and limited the President to expenditures necessary to union objectives. *See* Doc. 504 at 14–15. The motion does not claim unlimited presidential authority or zero responsibility for the Secretary-Treasurer.

The narrower question is who supplied substantive authorization and what role Mr. Creeden played afterward. Article 7 made the President the principal executive and administrative officer and authorized expenditures within union objectives. Article 5 separately empowered the IEC over business and financial affairs. Article 9 then assigned treasury and processing functions within that structure.

The government blurs two different functions when it uses the word "approve." Substantive authorization answers whether the union authorized the expenditure; financial

36

review, countersignature, and payment implement that decision. Article 9 assigned Mr. Creeden the latter functions. It did not make him the source of the President's or IEC's substantive authorization.

The "properly countersigned" language does not make the Secretary-Treasurer an appellate body over the President and IEC. Article 9 required nonroutine bills to be submitted to the President for approval and placed the Secretary-Treasurer under presidential supervision. 3 Trial Tr. 159–62.

Even if Article 9 imposed a meaningful checking function, the government still had to prove the charged expenditures were unauthorized and that Mr. Creeden knowingly participated in theft-like conversion. A dispute over the scope of his internal review duty does not establish either element. Scale reinforces the point. The record reflected roughly $83 million in annual IBB cash disbursements. 11 Trial Tr. 2324–25. In an organization operating at that scale, an IST-office countersignature cannot by itself prove that Mr. Creeden personally re-decided the substantive merits of every transaction his office processed.

### 2.    Witness shorthand cannot rewrite the Constitution.

The government next counters that Simmons, Fairley, Stapp, and Brown described the Secretary-Treasurer as an independent financial check who approved and countersigned expenditures rather than merely executing presidential commands, with Simmons characterizing the arrangement as a system of "checks and balances." See Doc. 504 at 14–15. Those descriptions do not alter the governing allocation of authority.

37

"Checks and balances" describes an institutional relationship. It does not establish that every presidential or IEC authorization remained ineffective unless Mr. Creeden independently re-decided the underlying policy judgment. Nor does a witness's use of "approve" establish that the IST supplied the substantive authorization for the underlying expenditure rather than verifying the financial review and countersignature necessary to pay it—as longstanding IEC policy had provided.

More fundamentally, the government again collapses duty into crime. Even if Mr. Creeden should have questioned an expenditure more aggressively, that proposition might address performance or fiduciary responsibility. Section 501(c) still required proof that he knowingly participated in an unauthorized, willful conversion.

The testimony therefore proves process involvement at most. It does not prove criminal appropriation count by count.

## B.    The same authorization defect defeats the remaining § 501(c) counts.

The motion argued that the same pattern recurred across the remaining § 501(c) counts. Travel moved through assignment letters and expense systems; compensation, vacation, relocation, legal expenses, and investment decisions moved through the President, IEC, and ordinary institutional processes; and the resulting transactions appeared in the union's normal accounting and reporting machinery. The government proved no secret accounts, hidden funds, fake invoices, concealed payment channels, or evidence that Mr. Creeden knowingly procured sham approvals. At minimum, any

38

ambiguity in the union's internal allocation of authority could not establish criminal intent beyond a reasonable doubt. Doc. 485 at 47–48.

### 1.    Financial responsibility is not strict criminal liability.

The government first counters that the remaining § 501(c) convictions could rest on Mr. Creeden's own independent responsibility for union expenditures because the IBB Constitution and trial testimony established a checks-and-balances system requiring his approval rather than mere implementation of Jones's decisions. *See* Doc. 504 at 14–15. Independent responsibility does not create strict criminal liability.

The Constitution did not say what the government's shorthand suggests. On cross-examination, Simmons was asked to read the IST duties and 'raise your hand' where they required Mr. Creeden to analyze the President's expenses for appropriateness. He never raised his hand and agreed: 'It's not worded that way.' 4 Trial Tr. 471–72.

Each count still required transaction-specific proof that the property was criminally converted without authorization, that Mr. Creeden participated in that conversion, and that he possessed the required intent. His title fills none of those gaps.

The trial instead showed transactions moving through ordinary union systems. Travel used assignment letters, receipts, expense forms, and accounting records. Compensation and personnel decisions moved through written administrative channels. Financial activity appeared in Great Plains, audits, LM-2 reporting, and ordinary records. The payment mechanics reinforce the office-versus-person distinction. Stapp testified that the check printer automatically applied the President's and Secretary-Treasurer's

signatures and that she and other employees had access to Mr. Creeden's signature stamp. 9 Trial Tr. 1961–62. A signature therefore did not itself prove a personal substantive-authorization decision by Mr. Creeden. Investigators found no secret accounts in Mr. Creeden's name, hidden union funds, transfers designed to conceal funds, or fake invoices. 12 Trial Tr. 2822.

Those facts do not prove every expenditure proper. They do defeat an inference of theft based on office alone.

### 2.   The LMRDA does not collapse fiduciary duty into embezzlement.

The government next counters that Mr. Creeden's federal fiduciary duties under the LMRDA existed independently of, and superseded, any contrary constitutional authority; and that Jones and Mr. Creeden knew those duties and themselves required lower-ranking union officials to obey them under threat of criminal prosecution. *See* Doc. 504 at 15–16. That argument conflates distinct statutory provisions.

Section 501(a) imposes fiduciary duties. Section 501(b) supplies a civil enforcement mechanism. Section 501(c) separately criminalizes embezzlement, stealing, unlawful abstraction, and willful conversion. Congress did not make every breach of subsection (a) a felony under subsection (c).

*United States v. DeFries,* 129 F.3d 1293 (D.C. Cir. 1997) rejects the same merger. *Id.* at 1306–07. Conduct that might violate a fiduciary duty does not automatically become an unauthorized criminal appropriation under § 501(c).

40

Knowledge of fiduciary duties therefore proves only that Mr. Creeden knew such duties existed. It does not prove that he understood each charged transaction to be an unauthorized theft. The government had to cross that statutory bridge on every count. Its response does not.

## V.    Other important counts warrant a judgment of acquittal.

### A.    Count 19 fails because the government proved neither principal liability nor aiding-and-abetting liability.

The motion argued that Count 19 fails under either possible theory of liability. If James O'Leary's assigned Italy travel supplied the principal § 501(c) offense, the government proved no criminal intent or criminal conversion by O'Leary for Mr. Creeden to aid and abet. *United States v. Willis,* 476 F.3d 1121 (10th Cir. 2007), and *United States v. Rufai,* 732 F.3d 1175 (10th Cir. 2013), require a culpable underlying offense and intentional assistance. And the principal-liability theory against Mr. Creeden failed because the government proved no receipt, personal benefit, or theft-like conversion by him beyond administrative processing of assigned travel expenses. Doc. 485 at 48–49.

#### 1.    Benefit to another does not prove the principal offense or shared intent.

The government first counters that Mr. Creeden need not have personally benefited from the travel of O'Leary (the IBB's official translator for Italian meetings) because § 501(c) permits conviction when union funds are converted for the benefit of another. *See* Doc. 504 at 16. That proposition does not answer the motion's core defect.

41

Aiding and abetting still requires a crime to aid. *United States v. Rufai,* 732 F.3d 1175 (10th Cir. 2013) requires proof that the underlying crime was committed and that the defendant intentionally facilitated it. *Id.* at 1190. Identifying O'Leary as the beneficiary of travel expenditures does not prove embezzlement.

The same is true of direct liability. "Use of another" expands the possible beneficiary. It does not eliminate unauthorized conversion or criminal intent.

The response therefore answers only the personal-benefit point. It still does not prove the underlying crime or Mr. Creeden's shared criminal purpose.

### 2.     Presidential travel authorization defeats the government's inference from reimbursement.

The government next counters that Mr. Creeden personally knew O'Leary's Italy trip was unnecessary because Mr. Creeden was himself on the trip and personally approved O'Leary's expenses. *See* Doc. 504 at 16. Even crediting both facts, neither proves embezzlement.

Presence shows that Mr. Creeden knew the trip occurred. It does not establish that he knew O'Leary lacked a union assignment or that the expenditure constituted criminal conversion. The record instead identified Newton Jones as the signatory on travel assignments. *See* 12 Trial Tr. 2601, 2785–86.

The government also conflates authorization of the trip with later processing of its expenses. The President assigned employees to travel; the Secretary-Treasurer's office processed the resulting reimbursement through the union's financial system. Simmons

testified that the Secretary-Treasurer was required to pay expenses authorized by the President. 3 Trial Tr. 160. Thus, even if Mr. Creeden later countersigned or processed O'Leary's reimbursement, that act does not show that he made the substantive decision to authorize the travel—much less that he intended to facilitate embezzlement.

The distinction parallels the broader § 501(c) defect. The government treats financial participation by the Secretary-Treasurer's office as though it supplied the underlying authorization and criminal objective. But processing an expense generated by a presidential travel assignment does not establish that Mr. Creeden agreed the trip was illegitimate.

Count 19 required proof of a criminal trip and Mr. Creeden's intentional assistance in that crime. A presidential assignment followed by ordinary finance-office reimbursement proves neither.

### B.    Count 45 fails because the government did not prove Mr. Creeden caused or intentionally assisted the payout.

The motion argued that Count 45 could not stand because the charged vacation payout occurred after Mr. Creeden had retired from the union. Section 501(c) requires proof tied to the defendant's own conduct in the charged transaction, not continuing responsibility based on a former office. The motion further emphasized that the trial record identified Dan McWhirter—not Mr. Creeden—as the person who approved the payout, leaving no affirmative act by Mr. Creeden that could support liability for the payment. Doc. 485 at 49–51.

### 1.    The government's timeline does not prove Mr. Creeden caused the payout.

The government first counters that the retirement premise is factually incorrect because ADP records show McManamon received the vacation payout on August 13, 2023, while IEC minutes state that Mr. Creeden did not retire until August 22, 2023 at 6:34 p.m. *See* Doc. 504 at 16. Even accepting that chronology, it does not prove Count 45.

A payment date before retirement establishes only that Mr. Creeden still held office when ADP transmitted the money. Section 501(c) and aiding-and-abetting law require conduct, not status. The government still must identify what Mr. Creeden did to cause, authorize, facilitate, or intentionally assist the payout.

The response never identifies that act. The trial evidence instead identified Dan McWhirter as the approver associated with the Exhibit 298 email. 10 Trial Tr. 2069–70. And by then Warren Fairley—not Newton Jones—was International President. *See* Doc. 1 ¶ 9. That sequence only sharpens the absence of evidence that Mr. Creeden personally authorized the payout.

The government's chronology may answer one factual premise in the motion. It does not answer the independent failure of proof tying Mr. Creeden to the transaction.

### 2.    Office-level inference is no substitute for an affirmative act.

The government next counters that the August 13 payment was "undoubtedly" approved by the Secretary-Treasurer's office before it was made. *See* Doc. 504 at 16. "Undoubtedly" is advocacy, not evidence.

44

The response cites no document bearing Mr. Creeden's approval, no instruction from him directing the payout, no communication in which he authorized it, and no witness identifying him as the decisionmaker. The response never identifies evidence that Mr. Creeden personally authorized the payout; it substitutes an inference about the office he headed for proof of conduct by the defendant himself.

The affirmative record points elsewhere. Stapp identified Exhibit 298 and confirmed approval by McWhirter. 10 Trial Tr. 2069–70. The government does not explain how McWhirter's approval becomes Mr. Creeden's affirmative act merely because the finance office later processed the payment.

*United States v. Willis,* 476 F.3d 1121 (10th Cir. 2007) requires an affirmative act intended to facilitate the offense. *Id.* at 1128. Holding office is not enough.

## VI.    The mixed verdict underscores the need for Rule 29 relief.

The motion acknowledged that the mixed verdict does not itself establish insufficiency. Its point was narrower: the substantial acquittals confirmed why the remaining convictions cannot be sustained by treating the trial as one undifferentiated narrative. Rule 29 requires count-by-count, element-by-element, defendant-specific review, and the jury itself rejected the government's effort to derive guilt wholesale from office, association, volume, and proximity to Newton Jones. Each remaining conviction therefore must stand on its own proof. Doc. 485 at 51.

The government counters only indirectly that Rule 29 requires the Court to view direct and circumstantial evidence and all reasonable inferences in the government's favor,

45

ask whether any rational jury could find guilt beyond a reasonable doubt, and refrain from reweighing conflicting evidence or witness credibility. See Doc. 504 at 1–2.

That standard is not disputed. The mixed verdict matters only because it reinforces the review Rule 29 already requires: each surviving conviction must stand on its own legal elements and its own evidence, not on the atmosphere of a long trial or Mr. Creeden's position within the IBB. The government still must prove every element of every count without speculation or borrowing proof from unrelated allegations.

## VII.   The government's theory has no limiting principle.

The motion concluded that the government's theories share one systemic defect: each deletes the element that separates internal governance from federal crime. RICO loses enterprise distinctness; § 501(c) loses authorization and theft-like conversion; wire fraud loses deception and its money-or-property object. *Van Buren v. United States,* 593 U.S. 374 (2021), and *Dubin v. United States,* 599 U.S. 110 (2023), reject readings of federal criminal statutes that transform commonplace conduct into crimes through near-limitless theories. The same bounded approach is required here. Doc. 485 at 51–55.

The government counters that the limiting-principle argument disregards Rule 29's procedural posture and confuses judicial interpretation with legislative policymaking; that Mr. Creeden is effectively asking the Court to prevent prosecution of union officials for racketeering and criminal fiduciary breaches committed while in office; and that any effort to change those statutory boundaries belongs before Congress, while the only question here is whether sufficient evidence allowed a rational jury to convict. *See* Doc. 504 at 17.

A.    **The government erases elements that separate governance from crime.**

The motion argued that statutory elements supply the limiting principles the government's case lacks. RICO requires an enterprise distinct from ordinary organizational activity. Section 501(c) requires an unauthorized, theft-like appropriation. Wire fraud requires deception directed at money or property. Those requirements prevent federal criminal law from becoming a general supervisory code for disputed questions of union, nonprofit, association, and corporate governance. *Van Buren v. United States,* 593 U.S. 374 (2021), and *Dubin v. United States,* 599 U.S. 110 (2023), reinforce the need to enforce those statutory limits rather than sweep commonplace conduct into federal crime. Doc. 485 at 51–52.

The government counters that the asserted disappearance of statutory limits reflects Mr. Creeden's disagreement with the existing reach of RICO and the LMRDA and that any narrower boundary must come from Congress. *See* Doc. 504 at 17. But Mr. Creeden asks for no new boundary. RICO's enterprise and agreement requirements, § 501(c)'s criminal-conversion requirements, and wire fraud's deception-and-property requirements already supply it. Enforcing those elements is not policymaking. It is the Rule 29 inquiry.

B.    **The theory turns ordinary organizational execution into felony exposure.**

The motion argued that the government's theory criminalizes implementation itself: a governing body approves, an officer executes, and prosecutors later recast a disagreement about routing, procedure, documentation, or judgment as theft and criminal intent. *Board of County Commissioners of San Juan County v. Liberty Group,* 965 F.2d 879

(10th Cir. 1992), preserves RICO distinctness; *United States v. DeFries,* 129 F.3d 1293 (D.C. Cir. 1997), preserves § 501(c)'s authorization requirement; and *Kelly v. United States,* 590 U.S. 391 (2020), and *Ciminelli v. United States,* 598 U.S. 306 (2023), preserve wire fraud's property boundary. Ordinary organizational execution does not become a felony merely because prosecutors challenge the underlying governance decision. Doc. 485 at 52–53.

The government counters that union office and use of organizational machinery do not shield officials from criminal liability, that RICO was specifically designed in part to combat corruption of labor organizations, and that Mr. Creeden's contrary position would improperly prevent prosecution of union officials who use their positions and union machinery for racketeering or criminal breaches of fiduciary duty. *See* Doc. 504 at 5–7, 17. Mr. Creeden claims no immunity for union officers.

Union officers can commit RICO, § 501(c), and fraud offenses. The point is that office and organizational execution cannot substitute for the elements that make their conduct criminal. The government must prove the line was crossed.

That boundary matters far beyond labor organizations. Corporations, nonprofits, associations, and other institutions all operate through officers who implement board decisions, internal policies, delegated authority, and governing documents. Those rules can be violated. Decisions can be poorly documented, procedurally defective, conflicted, or wrong. But an internal governance failure does not become a federal felony unless the government separately proves the elements Congress made criminal. Otherwise, routine

48

organizational administration becomes potential criminal exposure whenever prosecutors disagree with how an institution governed itself.

### C.    The trial proof confirmed that the government has no workable line.

The motion argued that the trial itself exposed the absence of an administrable boundary between lawful governance and the government's theory of crime. When pressed to identify objective standards separating permissible from criminal expenditures, the government's own witnesses could not do so. Newman acknowledged that the government used no objective accommodation scale and instead relied on a judgment call about reasonableness; Stojak's testimony reflected the same indeterminacy and arbitrariness. A criminal theory that investigators themselves cannot define supplies neither meaningful notice nor a workable legal boundary. Doc. 485 at 53.

The government counters that Mr. Creeden's complaint that prosecutors were permitted to "draw the line" concerning expenditures after the fact is a policy attack on the governing statutes rather than a Rule 29 argument, and that the relevant inquiry is instead whether the evidence permitted a rational jury to find the charged offenses. *See* Doc. 504 at 17. The trial evidence is exactly why the point matters.

The government's witnesses could identify expenditures they disapproved of but could not articulate an objective distinction separating criminal spending from lawful union judgment. That failure tracks the missing statutory elements. The answer is not a new policy rule; it is enforcement of authorization, criminal intent, distinctness, and property fraud as the law already defines them.

49

**D.      Federal criminal law cannot leave that line to prosecutorial discretion.**

The motion finally argued that prosecutorial restraint cannot substitute for statutory limits. *McDonnell v. United States,* 579 U.S. 550 (2016), *Marinello v. United States,* 584 U.S. 1 (2018), and *Dubin v. United States,* 599 U.S. 110 (2023), reject constructions that leave sweeping criminal statutes bounded only by charging discretion. Federalism reinforces the point. *Bond v. United States,* 572 U.S. 844 (2014), and *United States v. Bass,* 404 U.S. 336 (1971), reinforce the need for a bounded construction before federal criminal law displaces traditional domains of organizational governance. Doc. 485 at 53–55.

The government responds that narrowing federal criminal law belongs to Congress. *See* Doc. 504 at 17. But Rule 29 need not narrow anything: the statutes already contain the limits. Prosecutorial discretion cannot replace their elements, and enforcing them does not rewrite federal law.

## Conclusion

The motion for a judgment of acquittal should be granted as to all counts.

Respectfully submitted,

Federico Andino Reynal
The Reynal Law Firm, PC
917 Franklin Street, Sixth Floor
Houston, TX 77002
Tel: 713-228-5900
areynal@frlaw.us

Kurt P. Kerns # 15028
Kerns Law Group
328 N. Main Street Wichita, KS 67202
Tel: 316-265-5511
kurtpkerns@aol.com

/s/ Chad Flores
Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, TX 77002
Tel: (713) 364-6640
chad@chadflores.law

Attorneys for William Creeden

## Certificate of Service

A true and correct copy of the foregoing document was served via the Court's CM/ECF system to all registered counsel of record on the day of its filing.

 /s/ Kurt Kerns
Kurt Kerns

52